**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

KEVIN DEAN YOUNG,
Petitioner-Appellant,

v.

WILLIAM D. CATOE, Director, South

Carolina Department of Corrections;
CHARLES M. CONDON, Attorney
General, State of South Carolina,
Respondents-Appellees.

No. 99-6

KEVIN DEAN YOUNG,
Petitioner-Appellee,

v.

WILLIAM D. CATOE, Director, South

Carolina Department of Corrections;
CHARLES M. CONDON, Attorney
General, State of South Carolina,
Respondents-Appellants.

No. 99-8

Appeals from the United States District Court
for the District of South Carolina, at Charleston.
Matthew J. Perry Jr., Senior District Judge.
(CA-98-1742-2-10)

Argued: December 1, 1999

Decided: February 29, 2000

Before WILLIAMS, MICHAEL, and KING, Circuit Judges.

_____

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Williams and Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** Daniel J. Westbrook, NELSON, MULLINS, RILEY & SCARBOROUGH, Columbia, South Carolina, for Appellant. William Edgar Salter, III, Senior Assistant Attorney General, Columbia, South Carolina, for Appellees. **ON BRIEF:** John D. Delgado, Columbia, South Carolina, for Appellant. Charles M. Condon, Attorney General, John W. McIntosh, Chief Deputy Attorney General, Donald J. Zelenka, Assistant Deputy Attorney General, Columbia, South Carolina, for Appellees.

_____

**OPINION**

KING, Circuit Judge:

Kevin Dean Young, imprisoned in South Carolina under a sentence of death, appeals the district court's denial of his application for a writ of habeas corpus. The lower court rejected Young's claims that (1) his lawyer rendered ineffective assistance during the guilt phase of Young's murder trial; and (2) his death sentence was arbitrarily and capriciously imposed because the sentencing court declined to instruct the jury that the alternative of life imprisonment would ensure that Young served a minimum of thirty years. We agree with the district court that Young is not in custody in violation of the Constitution or laws of the United States, and we therefore affirm the judgment below.

I.

A.

Not long after nightfall on August 31, 1988, Young and two cohorts -- William Bell and John Glenn -- accosted Dennis Hepler on the grounds of the West Franklin Street Elementary School in

2

Anderson, South Carolina. Hepler, the school's principal, was working late that evening. During this encounter, Hepler was fatally shot in the back with a .25 caliber pistol. Young and the others fled the scene with Hepler's wallet, which contained less than seventy dollars.

Young was soon apprehended and charged with murder, of which he was convicted by a jury on May 18, 1989. That same jury subsequently found Young to have murdered Hepler in the commission of an armed robbery, and it recommended that Young be sentenced to death. See S.C. Code Ann. § 16-3-20(C)(a)(1)(d) (formerly (1)(e)) (West Supp. 1999) (specifying "robbery while armed with a deadly weapon" as a statutory aggravating circumstance justifying imposition of the death penalty upon conviction of murder). The trial court sentenced Young in accordance with the jury's recommendation, but that sentence was vacated on appeal because of numerous evidentiary errors infecting the sentencing phase. See State v. Young, 409 S.E.2d 352 (S.C. 1991) (affirming murder conviction but remanding for resentencing).

In June 1993, the question of Young's sentence was presented to a second jury. At the conclusion of those proceedings, Young was again sentenced to death based on the jury's finding that Young had murdered Hepler in the course of an armed robbery. The Supreme Court of South Carolina affirmed Young's sentence, State v. Young, 459 S.E.2d 84 (S.C. 1995) ("Young II"), and the Supreme Court of the United States denied review, Young v. South Carolina, 516 U.S. 1051 (1996).

B.

On May 22, 1996, Young filed an Application for Post-Conviction Relief in the Court of Common Pleas of Anderson County, South Carolina (the "PCR Court"). Young later amended the Application, with regard to which the PCR Court conducted an evidentiary hearing on January 16 and April 9, 1997. On July 31, 1997, the PCR Court entered a lengthy "Order of Dismissal" denying the Application with prejudice. Young petitioned for review of the PCR Court's order, but the Supreme Court of South Carolina denied certiorari on May 15, 1998.

With the possibility of state relief thus foreclosed, Young filed this application for a federal writ of habeas corpus in the district court on July 29, 1998. See 28 U.S.C. § 2254(a) (conferring jurisdiction on the federal courts to consider the claims of those in state custody that their confinement is "in violation of the Constitution or laws or treaties of the United States"). In reply, the Director of the South Carolina Department of Corrections[1] and the state's Attorney General ("the respondents") moved for summary judgment, submitting a number of exhibits in support thereof.

The respondents' motion was referred to a magistrate judge for initial consideration, pursuant to 28 U.S.C. § 636(b)(1)(B). In his Report and Recommendation filed October 28, 1998, the magistrate judge concluded that Young's application should be denied. Young timely filed written objections to the Report and Recommendation, requiring that the district court review de novo the disputed findings and conclusions. See 28 U.S.C. § 636(b)(1).

By order dated March 2, 1999, and judgment entered thereon, the district court denied Young's application for habeas relief. The court issued an expanded order ten days later, more fully explaining the reasons for its decision. On April 30, 1999, in response to Young's motions for reconsideration and to alter or amend the judgment, the district court amended its earlier explanatory order to correct certain misstatements of fact contained within. The court's judgment in favor of the respondents, however, remained unchanged. From the adverse judgment of the district court and its final amended order of April 30, 1999, Young appeals.

II.

During the multitude of state and federal judicial proceedings that have culminated in our review, Young's claims of constitutional error have been whittled to two: (1) his lawyer's trial performance in several particulars fell short of the competence demanded by the Sixth Amendment; and (2) the court's refusal at resentencing to instruct the

_____

[1] On November 3, 1999, William D. Catoe, the current Director of the South Carolina Department of Corrections, was substituted for the former Director as a party to this appeal.

4

jury so as to correct its misapprehension of the term "life imprisonment" violated Young's Fourteenth Amendment right to due process, with the result that the jury's decision to recommend a death sentence was not sufficiently reliable to assure his Eighth Amendment protection against cruel and unusual punishment. Both claims were considered and rejected at the state level, the first by the PCR Court and the second by the Supreme Court of South Carolina.

Regarding the ineffective assistance claim, the PCR Court concluded that Young's lawyer had competently pursued a trial strategy designed to maximize the possibility that his client would eventually escape a death sentence. The court opined that, even had counsel's performance been deficient, Young had suffered no attendant prejudice because his own trial testimony virtually assured that the jury would convict him.

With respect to the refused-instruction claim, the Supreme Court of South Carolina declared that Young's eligibility for parole in the event of a life sentence was irrelevant to the sentencing determination. See Young II, 459 S.E.2d at 87 (citing, inter alia, State v. Davis, 411 S.E.2d 220 (1991), for the proposition that "parole ineligibility is not relevant to a jury's sentencing considerations," absent the defendant's future dangerousness being placed at issue). To the extent that Young's parole status might have been relevant under the circumstances, the court characterized as "untenable" Young's contention that the jury's knowledge thereof may have resulted in a more lenient sentence. Young II, 459 S.E.2d at 87.

In the wake of the amendments to federal habeas law occasioned by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), our review of South Carolina's disposition of Young's constitutional claims is considerably limited:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).**2**

If, as is generally true, no Supreme Court case is controlling as to law and fact, habeas relief is warranted "only if the state court's resolution of a question of pure law rests upon an objectively unreason-

_____

**2** Young maintains that the standard of review mandated by the AEDPA amendments should not govern his ineffective assistance claim, inasmuch as the PCR Court's Order of Dismissal adopted almost verbatim the state's legal memorandum in opposition to his Application for Post-Conviction Relief. According to Young, the PCR Court's adoption in toto of the state's position evidences the lack of a considered "decision" within the meaning of Paragraphs (1) and (2) of § 2254(d), the existence of such decision being a prerequisite to the operation of the statute. See Black's Law Dictionary 407 (6th ed. 1990) ("decision" defined as "[a] determination arrived at after consideration of facts, and, in legal context, law").

It is true that, with regard to opinions and orders rendered by the district courts within this circuit, "[t]he adoption of one party's proposed findings and conclusions is a practice with which we have expressed disapproval on a number of occasions." Shaw v. Martin, 733 F.2d 304, 309 n.7 (4th Cir. 1984) (citing examples). Nonetheless, the disposition of a petitioner's constitutional claims in such a manner is unquestionably an "adjudication" by the state court. If that court addresses the merits of the petitioner's claim, then § 2254(d) must be applied. Thomas v. Davis, 192 F.3d 445, 455 (4th Cir. 1999) (standard of review set forth in § 2254(d) applies to all claims "adjudicated on the merits," i.e., "those claims substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree") (citing Cardwell v. Greene, 152 F.3d 331, 339 (4th Cir.), cert. denied, 119 S. Ct. 587 (1998)); see also Correll v. Thompson, 63 F.3d 1279, 1293 n.11 (4th Cir. 1995) (rejecting petitioner's argument that habeas court's factual findings were not entitled to presumption of correctness where court adopted state's version verbatim).

6

able derivation of legal principles from the relevant Supreme Court precedents, or if its decision rests upon an objectively unreasonable application of established principles to new facts." Green v. French, 143 F.3d 865, 870 (4th Cir. 1998), cert. denied , 119 S. Ct. 844 (1999).

There is little dispute concerning the facts, detailed below, underlying South Carolina's determination that Young's claims lacked merit; our focus instead is on the state's application of the relevant Supreme Court authorities to those facts. We are charged with deciding whether the South Carolina courts resolved in a reasonable fashion the questions of "pure law" presented here.

III.

A.

Young was represented at trial by James Robert Mann, a former prosecutor of considerable experience who had been retained by Young's family. Mann soon discovered that the prospects for his client's acquittal seemed bleak. Following his arrest for Hepler's murder, Young had given an oral statement to the police admitting: "I shot him. I'm the one who shot him. I pulled the trigger. William Bell shot him, too."

Mann examined the autopsy report, which revealed that Hepler had been shot twice, once in the back and once behind the right ear. The latter bullet exited to the right of Hepler's nose, resulting in nothing more than soft-tissue damage. The wound to the back, however, proved lethal; that bullet pierced Hepler's aorta, causing him to bleed to death.

Mann interviewed Young a number of times concerning the circumstances surrounding Hepler's death. On each occasion, Young related that he had fired the first, fatal shot into Hepler's back.[3] There-

_____

[3] See J.A. 1216 (state post-conviction testimony of James R. Mann). At the PCR hearing, Young's recollection of these interviews stood in stark contrast to Mann's. Young testified that he was unaware whether he had inflicted the mortal wound (or even whether the bullet from his weapon

7

after, according to Young, Bell seized the pistol and shot Hepler in the head.

In South Carolina, murder is defined as "the killing of any person with malice aforethought, either express or implied." S.C. Code Ann. § 16-3-10 (Law. Co-op. 1985). "Malice," in turn, is "the wrongful intent to injure another and indicates a wicked or depraved spirit intent on doing wrong." State v. Johnson, 352 S.E.2d 480, 481 (S.C. 1987) (citations omitted).

In light of the apparent facts and the applicable law, Mann decided that the best course of action was to concentrate his efforts -- not on Young's acquittal -- but on avoiding the imposition of the death penalty. At the PCR hearing, Mann described his thinking:

> Q: What was your assessment of the strength of the state's case against your client?
>
> A: Well, I thought it was overwhelming. As I indicated earlier, my -- I construed my job would be to save his life.

J.A. 1219.

Toward his goal of saving Young's life, Mann decided to pursue a strategy of being straightforward with the jury during the guilt phase, attempting to thereby enhance his credibility and that of his client. Mann hoped that this approach would pay dividends at the sentencing phase, persuading the jury to accept his primary argument -- that Young's conduct, though reprehensible, was not so egregious as

_____

had struck Hepler), and he steadfastly denied having told Mann anything to the contrary. The PCR Court, however, concluded that Mann was a truthful witness, while finding that Young's testimony lacked credence; the court therefore adopted Mann's version of the events germane to the formulation of his trial strategy. Because the PCR Court's factual determination in this regard was not unreasonable, see 28 U.S.C. § 2254(d)(2), and has not been rebutted by clear and convincing evidence, see § 2254(e)(1), we must accept Mann's testimony as true.

8

to merit a sentence of death. A key component of Mann's strategy was to demonstrate to the jury that Young was not evil, and that he was remorseful for the consequences of his actions. Mann therefore thought it necessary that Young testify in his own defense, a decision in which Young fully concurred.

Armed with his strategy of conciliation, Mann addressed the jury at the commencement of trial:

> Mr. Foreman, ladies and gentlemen, this case is going to be different. You're going to find that the defense is just as interested in getting at the truth as the State is .. . . You're going to find in this case that this is a . . . situational development that resulted in the unfortunate death of Dennis Hepler. No planning. No malice aforethought . . . . The codefendant [sic] fired what is somewhat admittedly an intentional shot, intended to kill. But it will be our contention that the shot fired by this defendant, <u>admittedly the fatal shot</u>, was very questionable in its intent for various reasons which you'll hear.

J.A. 666-67 (emphasis added). Later on, Mann returned to the question of Young's intent:

> Now, when I use the language to you of a situational killing, we're talking about a situation where there was no malice aforethought . . . . The law requires him to plead not guilty. <u>He's guilty. He acknowledges his guilt. Technically he's guilty. Morally he's guilty</u>. Because in a situation like that, you're presumed to intend the consequences of your act. The hand of one tends to be hand of all . . . . <u>The use of a deadly weapon causes an implication of malice just by the fact that it's a weapon</u>. You don't have to say I'm mean and I've got malice in my heart . . . . <u>[I]t's implied that you have malice if a gun was used</u>. So, that element is supplied.

J.A. 670 (emphasis added). Mann then continued:

> But when we look at murder . . . we think of planning, malicious intent. The fellow that goes in and robs a 24-hour

9

store, he attempts to do what he's doing. It's not forced on him by circumstances. It's not contributed to by other people. It's not contributed to by three boys drinking and wandering around engaged in minor degrees of devilness.

* * *

We don't dispute the basic circumstances which the State found. We congratulate the law enforcement officers for doing a good job in that connection. It's just our position that this is not the type of case where we need to take another life in order for justice to be done.

J.A. 670-71.

Unfortunately, Mann's opening presentation contained two stark misstatements of South Carolina law. To begin with, any defendant accused of a crime may enter a valid plea of guilty and forgo trial; the state statute permitting conviction by guilty plea admits of no exception for capital murder. See S.C. Code Ann. § 17-23-80 (Law. Co-op. 1985); see also S.C. Code § 16-3-20(A) ("A person who is convicted of or pleads guilty to murder must be punished by death, by imprisonment for life, or by a mandatory minimum term of imprisonment for thirty years.") (West Supp. 1999) (emphasis added).

Secondly, Mann's suggestion that the element of malice could be presumed from Young's use of a deadly weapon was directly contrary to the rule announced nearly six years earlier in State v. Elmore, 308 S.E.2d 781 (S.C. 1983), overruled on other grounds by State v. Torrence, 406 S.E.2d 315, 328 n.5 (S.C. 1991) (concurring opinion of Justice Toal, joined by a majority of the court). In Elmore, the Supreme Court of South Carolina abolished the state's long-standing practice of instructing juries in murder cases that the use of a deadly weapon mandated a presumption of malice. Id. at 784.[4] After Elmore,

_____

[4] In Gilbert v. Moore, 134 F.3d 642, 647 (4th Cir.), cert. denied, 119 S. Ct. 103 (1998), we observed that the "presumed malice" instruction unconstitutionally shifted the burden to the defendant with regard to an essential element of the crime of murder.

10

a jury could be instructed only that malice "may" be implied from the use of such a weapon. <u>See id.</u>

The state's case-in-chief proceeded rapidly through eleven witnesses, just six of whom Mann chose to cross-examine at all, and those but briefly. After the state rested, Mann called Young to the witness stand. Young described the encounter with Hepler as a chance meeting, which degenerated into a confrontation when Bell grabbed the necklace that Hepler wore and snatched it from his neck. As Hepler started toward Bell, Young raised the pistol that he was carrying and pointed it toward the principal. Bell then demanded Hepler's money; Hepler produced his wallet, and tossed it near Bell's feet. According to Young, the critical moment arrived as Bell attempted to retrieve the wallet:

> A: Okay. So, he tossed the wallet towards Bell. Bell turned, he had to walk to get the wallet. So, as Bell, he turned to get the wallet, so I turned all my attention towards Bell, which I still had the gun aimed, you know. I was paying attention to Bell. Before I knew it, the guy had swung. So, I kind of stumbled back on the steps and I fell backwards, and the gun just went off . . . . So, my friend Bell came and got the gun out of my hand.

\* \* \*

> I said, "John, let's get out of here, man." So, we started to run. John [Glenn] then asked me, he said,"Kevin, where's Bell at?" So we both stopped and turned around. We saw Bell aim the gun and fire the gun also.

> Q: Where was the man at that point?

> A: He was laying down.

> Q: All right. Could you see what part of him Bell fired at?

> A: He shot towards his head.

11

J.A. 798-99. After the prosecutor cross-examined Young, Mann summoned John Glenn to the witness stand. Glenn, however, invoked his Fifth Amendment privilege against self-incrimination and offered little useful testimony. The defense then rested.

In his closing argument, Mann returned to the theme that had dominated his opening statement. In essence, Mann admitted that Young was technically guilty of murder, but that he never planned to kill Hepler. Mann implored the jury to consider that the crime that Young had committed was "not the type of murder that society is going to determine should forfeit one's life."

B.

1.

A petitioner seeking to obtain relief from his conviction or sentence on the ground that his counsel rendered ineffective assistance must make two showings. First, he must demonstrate that counsel's performance was indeed deficient, i.e., that his lawyer failed in some respect to fulfill the role of adversary envisioned by the Sixth Amendment. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Second, it must be shown that the petitioner suffered prejudice attributable to counsel's deficiencies, i.e., that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id.

Counsel's performance is evaluated with regard to whether it "fell below an objective standard of reasonableness" under the circumstances. Id. at 688-90. The test is rigorous: "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689 (citation and internal quotation marks omitted).

With respect to the prejudice requirement, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

12

different." Id. at 694. The level of certainty is something less than a preponderance; it need not be proved that counsel's performance more likely than not affected the outcome. Id. at 693. Instead, the petitioner need only demonstrate "a probability sufficient to undermine confidence in the outcome." Id. at 694.

2.

The crux of Young's ineffective assistance claim is that Mann, during his opening statement, abdicated his role as advocate for the defense by conceding: (1) that Young was guilty of the charge of murder, including the essential element of malice; and (2) that Young fired the shot that killed Hepler. Young contends that, had Mann contested the state's evidence tooth and nail, there was a reasonable probability that the jury would have convicted him of manslaughter instead of murder.[5]

a.

i.

Our precedents plainly illustrate that counsel's concession of a client's guilt does not automatically constitute deficient performance. Rather, we must heed Strickland's admonition to consider the totality of the circumstances confronting the lawyer in order to accurately evaluate the reasonableness of the conduct at issue.

In Clozza v. Murray, 913 F.2d 1092 (4th Cir. 1990), a capital habeas proceeding, we addressed the petitioner's claim that defense counsel had rendered ineffective assistance at trial by making a number of remarks intended to put distance between counsel and the petitioner, with the result that the jury may have perceived counsel to have effectively conceded the petitioner's guilt. We acknowledged that, under Strickland, a trial strategy designed to maintain counsel's credibility with the jury could be reasonable, notwithstanding the possibility of short-term harm to the defendant. The lawyer in Clozza,

_____

[5] South Carolina defines manslaughter as "the unlawful killing of another without malice." S.C. Code § 16-3-50 (West Supp. 1999).

13

faced with "overpowering" proof against his client, id. at 1101, was left with the sole hope of convincing the jury to accept his characterization of the evidence and ignore those portions of the defendant's trial testimony inconsistent with an intoxication defense. We observed that the remarks at issue

> indicated to the jury that defense counsel understood the gravity of the crimes as well as their horrible nature. Had counsel attempted to pass the crimes off as anything other than the atrocities that they were, his credibility with the jury would most certainly become suspect. Thus, we conclude that counsel's remarks were consistent with his trial strategy.

Id. at 1099.

Our subsequent decision in Bell v. Evatt, 72 F.3d 421 (4th Cir. 1995), makes the point more precisely. In that case, the petitioner's lawyer, attempting to secure a guilty-but-mentally-ill verdict for his client on charges of murder and kidnaping, explicitly told the jury during his closing argument that his client was guilty of the latter. We rejected the petitioner's claim that counsel had represented him ineffectively, noting that the evidence supporting the kidnaping charge was "overwhelming," id. at 429, and that

> [i]t was important for the defense to retain some credibility so that the jury would be sympathetic to the defense witnesses testifying that Bell deserved mercy . . . .[T]he decision to pursue a GBMI verdict was a strategic one that Bell and his trial counsel agreed to . . . . All indications lead us to conclude that the decision to concede his guilt was a rational one . . . . Id. at 428 (internal quotation marks omitted).[6]

_____

**6 See also United States v. Leifried**, 732 F.2d 388, 390 (4th Cir. 1984) (counsel not ineffective for admitting defendant's guilt of individual drug offenses where evidence was overwhelming and concession's purpose was to persuade the jury that defendant was innocent of operating a continuing criminal enterprise).

14

Clozza and Bell stand for the proposition that, on occasion, it is best to risk losing the battle in the hope of winning the war. "There is a distinction which can and must be drawn between a statement or remark which amounts to a tactical retreat and one which has been called a complete surrender." Clozza, 913 F.2d at 1099. As we thereafter recognized, "[s]ome remarks of complete concession may constitute ineffective assistance of counsel, but tactical retreats may be reasonable and necessary within the context of the entire trial, particularly when there is overwhelming evidence of the defendant's guilt." Bell, 72 F.3d at 429.

In Clozza, it was necessary for counsel to retreat from being identified too closely with the cause of his client, if the latter were to stand any chance of benefiting from the former's credibility. In Bell, it was necessary for counsel to retreat from pursuing acquittal on the charge of kidnaping, in order to increase the likelihood that the jury would return a verdict of something less than unequivocal guilt of murder. And, in the case now before us, it was necessary for counsel to retreat from an unlikely acquittal of a patently guilty client, so that he might attain the more realistic goal of saving the client's life.

That was, at least, the reasoning of the PCR Court, which found that, in the face of "an overwhelmingly strong case" against Young,[7]

> counsel felt that the best way to save [Young's] life was if he gave the jury the appearance that he was willing for the truth to come out concerning the murder and was remorseful for his role in it . . . . Obviously, counsel's concession is consistent with the overall strategy of conceding that [Young] was technically guilty of murder but did not deserve the death penalty.

_____

[7] In addition to Young's confession, detailed supra at 7, witnesses placed Young in the vicinity of the school near the time of the shooting, the murder weapon had been hidden just outside the front door of Young's residence, and Young had told his mother that investigators were accusing him of a "shooting at the school," when the officers had not yet revealed the purpose of their visit to the family's home.

15

J.A. 1738-39. The court concluded that "counsel's strategic decision -- made only after investigation and with [Young's] express approval[8] -- was reasonable." J.A. 1726.

With regard to the Sixth Amendment's requirement that trial counsel render competent assistance, the PCR Court's interpretation of the applicable Supreme Court precedents is largely in accord with our own, as evidenced by the similarities in circumstances, analysis, and result between this case on one hand, and Clozza and Bell on the other. Insofar as one could argue, however, that the PCR Court's decision is an extension of Strickland and its progeny beyond the limits of what we have previously sanctioned, it nevertheless does not represent an unreasonable application of clearly established federal law. Consequently, paying strict heed to the standard of review set forth in § 2254(d)(1), we must uphold the PCR Court's conclusion that Mann's concession of Young's guilt did not constitute deficient performance.[9]

_____

[8] At the PCR hearing, Young denied having discussed with Mann any trial strategy. As we observed supra in note 3, however, we are bound to accept the PCR Court's contrary finding. Nonetheless, Young points out that Mann's own testimony acknowledged that they discussed the decision to "concede guilt" only to the extent that Mann promised Young that his arguments to the jury would be crafted to Young's anticipated testimony. Young's testimony, of course, established that he was guilty of murder. See supra at 12. Hence, the PCR Court's finding of consent has not been rebutted by clear and convincing evidence, and is not unreasonable.

[9] It is of little moment that Mann also conceded the presence of malice. As we noted supra at 9, malice is an essential element of the crime of murder in South Carolina. By conceding Young's guilt of murder, Mann necessarily conceded that Young acted with malice aforethought. In the event that the jury might have ascribed unintended meaning to counsel's concession, i.e., viewed Young as a malicious person within the lay definition of the term, Mann effectively negated that possibility by portraying his client in a positive light during the balance of his opening. Further, to the extent that the prosecution's burden of proof was in danger of being ameliorated as the result of Mann's misstatements concerning implied malice, that danger was avoided as the result of the trial judge giving a proper malice instruction prior to the jury commencing its deliberations.

16

ii.

We likewise sustain the PCR Court's ruling that Mann acted reasonably in admitting that Young had fired the fatal shot, even though the state's evidence ultimately proved inconclusive on this point. Given the defense theory that Young had more or less accidentally discharged the pistol, Mann needed to associate Young's actions with the shot to Hepler's back, rather than the execution-style coup de grce administered afterward. The basis for Mann's argument was, of course, what Young had repeatedly told him during their interviews, which was later confirmed by Young's trial testimony that Bell had fired toward Hepler's head.

Moreover, putting the state to its proof regarding who fired which shot would have served little purpose, inasmuch as Young's conviction did not rest on his having actually inflicted the fatal wound. The trial court instructed the jury consistently with South Carolina's "hand of one, hand of all" doctrine: "[W]hen two or more persons aid, encourage, and abet each other in the commission of a crime, all being present, all are principals and equally guilty." State v. Hicks, 185 S.E.2d 746, 748 (S.C. 1971) (citation omitted). **10** The jury was not

_____

We close our discussion of this section by noting finally Young's remaining colorable claims of deficient performance, specifically that: (1) during the hearing on the admissibility of Young's confession, Mann failed to call a witness that would have corroborated Young's testimony that he was intoxicated; (2) Mann engaged in little meaningful cross-examination of the state's witnesses; and (3) Mann's closing argument compounded the errors that he purportedly made during his opening statement, and was otherwise ineffective. We have fully considered the PCR Court's disposition of all of these claims, and we conclude that no relief is warranted under § 2254(d)(1).

**10** In State v. Chavis, 290 S.E.2d 412 (S.C. 1982), the Supreme Court of South Carolina stated:

> When several people pursue a common design to commit an unlawful act and each takes the part agreed upon or assigned to him in an effort to insure the success of the common undertaking, the act of one is the act of all and all are presumed to be present and guilty.

17

instructed that, to convict Young, it had to first rule out Bell as the deliverer of the mortal wound.**11** In essence, then, Young had much to gain and little to lose from Mann's "concession."

b.

Even were we persuaded that the PCR Court unreasonably applied clearly established federal law in concluding that Mann's trial performance was adequate, we would still be constrained to deny relief in this case because we can find no fault with the PCR Court's alternative holding that Young suffered no prejudice as the result of Mann's allegedly defective representation. Put simply, Young's own statements admitted all of the facts required for a conviction, and those statements were unaffected by the performance of his lawyer.

Young's statements were introduced through two sources: (1) the arresting officer; and (2) Young himself. At trial, the officer testified that the following exchange took place between himself and Young after the arrest:

> [Officer]: [H]e said that he and John Glenn and William Bell, Jr. were together on the night of Wednesday, August 31st; he says that they all walked around to the West Frank-

_____

Id. at 412-13 (citation and internal quotation marks omitted). Young contends that the language in Chavis referring to a common design or undertaking engrafted a premeditation requirement onto the "hand of one" doctrine, an ingredient that he asserts is missing from the relatively spontaneous acts at issue here. We disagree with Young's premise. We read Chavis to simply stand for the notion that, where a criminal act is in fact perpetrated as the result of a deliberate plan or scheme, the "presence" requirement of Hicks may be foregone and liability as a principal imposed on those conspirators absent during the actual execution of the crime.

**11** Indeed, prior to Young's trial, Bell was convicted of capital murder arising out of the same incident, notwithstanding that the evidence in that proceeding indicated that Young had fired the shot that killed Hepler. The trial judge in that case also gave the "hand of one" instruction. See State v. Bell, 406 S.E.2d 165, 169-70 (S.C. 1991).

18

lin Street School and they saw a car parked outside and they went through the car. At that time Kevin Young said,"I shot him. I'm the one who shot him. I pulled the trigger. William Bell shot him too."

At that time I asked, "Why did you shoot him?"

And Kevin Young replied, "I don't know, man. I just shot him. Bell shot him, too."

J.A. 774.

Between the statement to the officer and Young's in-court testimony (summarized supra at 11-12), Young admitted that: (1) he had fired a shot against Hepler and hit him in the back; and (2) he shot Hepler during the course of an armed robbery in which he was an active and willing participant. Young's own testimony therefore established that he shot Hepler while intentionally and wrongfully holding the principal at bay so that Bell could rob him.**12**

Thus, from Young's undisputed statements alone, there was direct

_____

**12** The respondents, via the unnecessary vehicle of cross-appeal, assert that the district court's judgment with respect to Young's ineffective assistance claim should be affirmed on the alternative ground of procedural default. The respondents argued below that Whetsell v. State, 277 S.E.2d 891 (S.C. 1981), and related authorities barred federal collateral review of state convictions where the petitioner had admitted guilt at trial. The Supreme Court of South Carolina has since rejected that view of Whetsell. See Johnson v. Catoe, 520 S.E.2d 617 (S.C. 1999).

Undaunted, the respondents now maintain that federal merits review is foreclosed because Young's state petition for certiorari from the PCR Court's denial of relief did not, within its broad allegations setting forth the gist of the ineffective assistance claims, specifically argue that the lower court's invocation of Whetsell was in error. However, when the state filed its return to the petition listing the procedural bar ruling as an additional sustaining ground, Young submitted a reply in opposition. The district court ruled that, under the circumstances, Young's claim of ineffective assistance was properly exhausted before the state courts. We agree.

19

evidence that Young killed the victim in the course of an armed robbery -- an "aggravating circumstance" justifying the death penalty under South Carolina law. We are convinced that there was no reasonable probability that the jury in this case would have returned a verdict of manslaughter absent the purported errors of counsel.

We decline Young's invitation to presume prejudice from his counsel's trial performance. In an extraordinary situation, a petitioner may be relieved of making a specific showing of prejudice in support of his ineffective assistance claim. That approach, however, is appropriately limited to those rare cases where the petitioner has been denied counsel at a critical stage of the court proceedings, or where counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing[.]" United States v. Cronic, 466 U.S. 648, 658-60 & n.25 (1984). Young was in no way denied counsel, and the latter situation is not present here.

IV.

Young also contends that the resentencing court erred in refusing to instruct the jury that, if the jury sentenced him to life imprisonment in lieu of imposing a sentence of death, Young would not be parole eligible for thirty years. In this regard, Young argues: (1) that his proposed instruction was mandated by Simmons v. South Carolina, 512 U.S. 154 (1994); and (2) that the absence of such an instruction violated due process, inasmuch as several of the jurors expressed confusion during voir dire about the meaning of "life imprisonment."

Young's first argument -- that his proposed instruction was mandated by Simmons -- is grounded in the Eighth and Fourteenth Amendments. The Eighth Amendment, by incorporation through the Fourteenth, prohibits the states from limiting the sentencer's consideration of any relevant fact that might cause it to decline to impose the death penalty. Payne v. Tennessee, 501 U.S. 808, 824 (1991) (citation omitted). More particularly, in Simmons, the Supreme Court held that the Due Process Clause of the Fourteenth Amendment requires a sentencer to be informed as to the probable duration of a "life" sentence before it may decide on the alternative of death based on the defendant's future dangerousness.

20

Simmons stands for the proposition that"where the State seeks to show that the defendant will be a future danger to society, the presentation of the fact that the defendant will never be paroled and released into the general public will often be the only way in which a violent criminal can successfully meet the State's case." Roach v. Angelone, 176 F.3d 210, 220 (4th Cir. 1999). Because due process requires that a criminal defendant "be allowed to meet the State's case against him, . . . where the defendant is truly ineligible for parole, the Due Process Clause entitles the defendant to inform the jury of that fact." Id. at 219-20.

We recently rejected the application of Simmons where the defendant would be parole eligible, however, noting that,"In a State in which parole is available, the Constitution does not require (or preclude) jury consideration of that fact." Roach, 176 F.3d at 220 (quoting Simmons, 512 U.S. at 176). In evaluating Young's claim of error, the Supreme Court of South Carolina similarly noted that it is up to the states to determine which sentencing considerations are "relevant" for Eighth Amendment purposes. Young II at 87 (citing California v. Ramos, 463 U.S. 992, 1001 (1983)). The court then reaffirmed its rulings in previous cases that a defendant's eligibility for parole was not a relevant factor that a jury ought to consider, holding that "Simmons is inapposite as it involves a defendant's ineligibility for parole and not, as here, information that the defendant would one day be released from prison." Young II at 87 n.6.

We agree with Young that the State did, in fact, refer to Young's future dangerousness at the resentencing phase (although the State did so without specifically relying upon his future dangerousness as a basis for seeking the death penalty),**13** and that these references were sufficient to place Young's future dangerousness at issue. Nonetheless, because there is no dispute that Young would have been parole eligible in thirty years, we do not believe that the Supreme Court of South Carolina's conclusion was unreasonable or that Young's claim entitles him to habeas relief.

_____
**13** The Supreme Court of South Carolina noted that "[e]vidence was presented concerning Young's character and his prior criminal record." Young II, 459 S.E.2d at 87 n.4.

21

Young's second argument -- that juror confusion necessitated his proposed instruction -- also fails under the facts present here. When asked on voir dire about the likely duration of a life sentence, one juror responded that the defendant would serve "about twenty years." A second juror answered that a person so sentenced would not necessarily spend the rest of his life in prison. All but two of the remaining jurors also expressed an opinion on the matter; each believed that a life sentence foreclosed the possibility of parole.

Although the district court subsequently refused Young's request to inform the jury of the thirty-year minimum, the court did instruct the jury that "the terms `life imprisonment' and `death sentence' should be understood in their ordinary and plain meaning." J.A. 1929. In other words, the district court -- by instructing the jury that life imprisonment means "life imprisonment" -- effectively gave Young more than he asked for, and any uncertainty on the part of the jury in this regard should have been obviated by the court's instruction. Juries are presumed to follow the court's instructions, see United States v. Francisco, 35 F.3d 116, 120 (4th Cir. 1994), and we do not believe that the Supreme Court of South Carolina's rejection of this claim was unreasonable. Consequently, Young's petition for habeas relief on this basis fails.

V.

Upon reviewing the parties' briefs and the arguments of counsel, we cannot say that the Supreme Court of South Carolina unreasonably applied clearly established federal law as determined by the Supreme Court of the United States. Hence, § 2254(d)(1) admits of no ground upon which relief may be granted Young.

Based on the foregoing, we conclude that Young is not entitled to a writ of habeas corpus. The judgment of the district court is therefore affirmed.

AFFIRMED

22