Richard LONGWORTH, SK
# 4812, Petitioner,

v.

Jon E. OZMINT, Commissioner, South Carolina Department of Corrections; and Henry D. McMaster, Attorney General, State of South Carolina, Respondents.

No. CIV.A. 3:02–0744–08.

United States District Court,
D. South Carolina.

Nov. 3, 2003.

David Grant Belser, Tanya Louise Davis, Belser and Parke, Asheville, NC, Robert Michael Dudek, SC Office of Appellate Defense, Columbia, SC, Amy E Ray, Asheville, NC, for petitioner.

Donald John Zelenka, SC Attorney General's Office, Columbia, for respondents.

## ORDER

BLATT, Senior District Judge.

### INTRODUCTION

The Petitioner is an inmate under a sentence of death which was entered by the Court of General Sessions for Spartanburg County on September 10, 1991. He has filed this petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254.[1]

---

1. The caption of this case was originally Longworth v. Maynard and Condon. However, since the filing of this action, Jon E. Ozmint has succeeded Gary D. Maynard as Commissioner of the South Carolina Department of Corrections, and Henry D. McMaster has succeeded Charles Condon as Attorney

For the reasons that follow, the petition for writ of habeas corpus is denied.

## BACKGROUND AND PROCEDURAL HISTORY

As described by the Supreme Court of South Carolina on direct appeal, see State v. Longworth, 313 S.C. 360, 438 S.E.2d 219 (1993), the underlying facts of this case are as follows:

[Longworth] was convicted of kidnapping, armed robbery, and two counts of murder in connection with the deaths of Alex Hopps and James Todd Greene, employees of the Westgate Mall Cinema in Spartanburg. [Longworth] was sentenced to death for the murders and kidnapping plus twenty-five years for armed robbery.[2]

. . .

The murders in this case occurred on the night of January 7, 1991. An off-duty employee, David Hopkins, returned to the Westgate Mall Cinema and found no employees present although films were still being shown. The body of nineteen-year-old Alex Hopps was discovered behind the theatre outside an exit door. He had been shot at close range in the left temple.

When Hopkins arrived at the theatre he had seen and recognized [Longworth's] co-defendant, David Rocheville, rummaging through James Greene's car in the parking lot.[3] Greene was the other employee on duty with Alex Hopps and he was missing from the theatre. Police arrested Rocheville at 5:00 a.m. the next morning. A few hours later, Rocheville led police to the body of James Greene which was found in a shallow ditch on the side of a rural road several miles from the cinema. [Longworth] was arrested later that day.

[Longworth] consented to be interviewed by police officers after waiving his rights. At the end of the interview, Chief [Deputy James] Murray prepared the following statement from his notes:

[Longworth] stated that on January 7, 1991, he left his home at approximately four o'clock p.m. in route to meet his friend, David Rocheville, at a television repair shop where Rocheville worked. After meeting him, they both traveled to Rocheville's home in Duncan, South Carolina where Rocheville cleaned up. They left there in Longworth's mini van that is actually owned by his father in route to the Continental Café located in the Hillcrest Mall in Spartanburg.

They arrived there at approximately 7:30 p.m. where he, Longworth, drank approximately six beers and three kamikazes. While there, they spoke to a bartender by the name of Larry, last name unknown, who works there and knows them. After leaving the café, he and Rocheville drove around town in the mini van for a short time, and eventually stopped at an unknown place between Hillcrest and West Gate where they purchased a twelve pack of beer. They continued driving around all the while drinking beer, and decided to rob the West Gate Cinema.

They arrived at the West Gate Theatre at an unknown time. But he

General of the State of South Carolina. The parties have not requested a change in the caption, but have noted the new officers in all pleadings and motions filed since March 2003.

2. [Longworth's] co-defendant, David Rocheville, was convicted in a separate trial and sentenced to death. See State v. Rocheville, [310 S.C. 20,] 425 S.E.2d 32 (1993).

3. Both [Longworth] and Rocheville were former employees of the theatre owner.

knows it was before twelve o'clock midnight. Upon entering the theatre, Longworth remembered seeing James Greene, an employee, and, in fact, waved to him. Longworth and Rocheville walked around inside the theater for a short time, and believed the two of them went inside where the movie Dances with Wolves was playing. Longworth remembers that when they entered the theater through the front door, there was no one in the ticket booth. And accordingly, they walked in without having to pay.

After being seated in the theater for a short time, they decided it was time to rob the place. As they walked out toward the lobby of the theater, Longworth saw the usher, Alex Hopps, standing near the end of a counter. He went over to him, and they started walking down a hallway talking. His plan was to take the usher outside and knock him unconscious.

As they walked down the hallway, he knocked the usher to the floor by sweeping his feet out from under him. He then immediately jumped on him, and placed his hands over the usher's mouth. Rocheville, who had been given the gun that Longworth had carried into the theater in a shoulder holster hidden under his coat, was watching the activity. As Longworth and the usher walked outside using a side exit near where he and Rocheville had been seated in the theater, they were followed by Rocheville.

Once outside, Longworth stated that he grabbed the usher by the right arm and twisted it up behind his back. He then forced the usher to lean over a waist high bar that was in place to, to protect the building or a cooling unit, and then took his left hand pushing the usher or pinning

him on the bar. Rocheville then shot the usher in the left side of the head while Longworth was holding him. The weapon used and the one which Longworth earlier had given to him is [a] .44 magnum Ruger, and it was loaded with semi wod cutters.

After the shooting, Rocheville returned the weapon to Longworth, and he placed it in the aforementioned shoulder holster. Longworth stated that he did not know the usher although it was pointed out to him that the usher had at one time worked for him at the Converse Theaters when Longworth was an assistant manager. After the shooting, Longworth advised that he and Rocheville walked around to the front of the theater to proceed with the robbery. However, when they arrived at the front, the doors were locked.

Longworth stated that he again saw James Greene, and motioned to him to open the doors. Greene complied. Once inside, Longworth stated that he drew this same gun on Greene, and stated something to the effect that he was sorry. But he was going to rob the theater. And requested that Greene open the safe. Greene, upon seeing the gun, became so nervous that it took him three tries to successfully open the safe.

Longworth took several money bags from the safe, and then asked Greene if he had made the deposits. Greene responded yes, and Longworth stated don't lie to me. Greene stated that the deposits were in his personal car. The three of them, Longworth, Greene, and Rocheville then walked to Greene's vehicle parked at the side of the cinema, obtained the remaining money bags, and gave them all to Rocheville. They then all got into the aforementioned mini van, which was

parked next to Greene's vehicle. Longworth was driving. Rocheville was in the back. And Greene was seated in the passenger side.

Longworth stated that he then gave the .44 magnum Ruger to Rocheville, and stated if he moves shoot him referring to Greene. The three of them then proceed to drive up highway number 176 toward Inman, and then turned right off number 176 onto an unknown road. They drove a short distance and stopped the van. Longworth then told Greene to get out of the van, walk five paces, get down on your knees, and stare straight ahead.

He did as instructed. And at this point, Rocheville got partially out of the van perhaps with one foot on the ground and the other in the van, and shot Greene in the back of the head. Greene then rolled over into the ditch near where he had been kneeling.

*Id.* at 220, 222–24 (footnotes included but renumbered).

After the South Carolina Supreme Court rejected the appeal, *id.* at 225–26, and the United States Supreme Court denied certiorari, *Longworth v. South Carolina,* 513 U.S. 831, 115 S.Ct. 105, 130 L.Ed.2d 53 (1994), the Petitioner filed an application for state post-conviction relief (PCR). The state PCR court permitted discovery and held a lengthy evidentiary hearing. After requesting supplemental briefs, the PCR court directed the Respondents to submit a proposed order, which was substantially adopted by the PCR court in denying relief. The Supreme Court of South Carolina denied review.

The Petitioner then filed the instant petition for federal habeas relief, challenging his conviction and sentence on nineteen grounds. This Court stayed the Petitioner's scheduled execution in March, 2002, in order that his petition could be fully and completely evaluated. By local rule, this matter was referred to United States Magistrate Judge Joseph R. McCrorey for preliminary determinations. The Petitioner filed a substantive brief, to which the Respondents filed a motion for summary judgment. The Petitioner then filed a reply to the motion and requested partial summary judgment or, in the alternative, an evidentiary hearing on one of the grounds presented.

On June 6, 2003, the Magistrate Judge issued a report analyzing the issues presented and recommending that the Respondent's motion for summary judgment be granted, that the Petitioner's motion and request be denied, and that the petition for writ of habeas corpus be denied. The Petitioner filed objections to the report and recommendation on June 30, 2003, to which the Respondents have not responded. The matter is now ripe for decision.

## DISCUSSION

### I. Procedural Objections

#### A. § 2254(d) and § 2254(e)(1)

■ Prior to submitting substantive objections to the Magistrate Judge's findings and conclusions, the Petitioner submits a lengthy argument concerning the applicability of 28 U.S.C. §§ 2254(d) and (e)(1), which outline the standard of review in § 2254 petitions. Subsection (d) provides that no writ of habeas corpus may issue

to any claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination

of the facts in light of the evidence presented in the State court proceeding. Likewise, subsection (e)(1) provides that in reviewing applications under § 2254,

> a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Without challenging specific facts, the Petitioner argues generally that because the PCR court adopted the Respondents' proposed order, "the Attorney General was the sole author of the order denying petitioner state post-conviction relief," and, as such, "the state PCR court abdicated it[s] duty to exercise independent judgment in this case." The argument further asserts that the mere adoption of a proposed order submitted by one party renders the PCR court's determination to be neither an "adjudication" nor a "decision," and, consequently, that it is entitled to no deference under § 2254 and that the Magistrate Judge and this Court should review all claims for relief *de novo*.

Facially, this argument is temptingly appealing, as it lends itself to broad pronouncements hailing the importance and uniqueness of the American system of jurisprudence, with which few learned men could disagree. *See McAlester v. Brown,* 469 F.2d 1280, 1283 (5th Cir.1972) ("the independence of the judiciary must not be sacrificed one microscopic portion of a millimeter"); 9A Wright and Miller, Federal Practice & Procedure: Civil 2d § 2578 ("All courts agree that finding the facts is an important part of the judicial function and that the judge cannot surrender this function to counsel."). However, as to the legal force of such an argument in the specific context of the standard of review under 28 U.S.C. § 2254, this claim quickly loses its appeal.

The Fourth Circuit has expressly rejected this very argument on two separate occasions, when it was raised by co-defendants sentenced to death. First, in *Young v. Catoe,* 205 F.3d 750, 755 & n. 2 (4th Cir.2000), the petitioner argued that "the PCR Court's adoption *in toto* of the state's position evidences the lack of a considered 'decision' within the meaning of Paragraphs (1) and (2) of § 2254(d), the existence of such decision being a prerequisite to the operation of the statute." The Fourth Circuit responded as follows:

> It is true that, with regard to opinions and orders rendered by the district courts within this circuit, "[t]he adoption of one party's proposed findings and conclusions is a practice with which we have expressed disapproval on a number of occasions." Nonetheless, the disposition of a petitioner's constitutional claims in such a manner is unquestionably an "adjudication" by the state court. If that court addresses the merits of the petitioner's claim, then § 2254(d) must be applied.

*Id.* at 755 n. 2 (citations omitted) (alteration by *Young* court). Similarly, the Fourth Circuit cited *Young* with approval in rejecting this argument in *Bell v. Ozmint,* 332 F.3d 229, 233–34 (4th Cir.2003).

> Bell contends that the district court erred in choosing to apply § 2254(d)'s deferential standard of review, and that "this case must be remanded to the district court for a *de novo* review of the facts and law with respect to every claim for relief." Bell bases his claim on the fact that the state PCR court, after receiving post-hearing briefs, invited proposed findings of fact and conclusions of law from both parties; it received none from Bell and largely adopted the State's proposed memorandum and order....
>
> Although we do not applaud this practice, circuit precedent dictates that it does not provide any basis for applying

*de novo* review. Indeed, we recently rejected precisely this claim by Kevin Young, one of Bell's co-perpetrators. *See Young v. Catoe,* 205 F.3d 750, 755 n. 2 (4th Cir.2000).

The *Bell* decision further notes that this analysis applied regardless of whether the claim was made under § 2254(d)(1) or (d)(2). *Id.* at 233–34.

Here, the Petitioner cites neither *Young* nor *Bell* in his objections, and proposes no distinction through which this Court could distinguish circuit precedent which appears to be precisely on point. The Court agrees with the Petitioner, as does the Fourth Circuit, that this method of issuing orders is not the preferred method of decision-making. However, without more specific proof there is nothing in the law requiring the Court to review the state PCR court's decision *de novo.* Consequently, the Petitioner's procedural objections are denied.

### B. *Failure to Object to Report and Recommendation*

In issuing the report and recommendation, the Magistrate Judge addressed each of the Petitioner's nineteen grounds for relief, and denied each either on the grounds of procedural bypass, on their individual merits, or both. In his objections, the Petitioner only addresses the specific merits of four grounds—Ground 4, Ground 11, Ground 15 and Ground 19. Pursuant to 28 U.S.C. § 636(b),

Within ten days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court

4. The Court also rejects any attempt by the Petitioner to maintain objections by incorporating arguments presented in earlier briefs by reference. Section 636(b) requires specific written objections to be made, and a broad re-assertion of all prior arguments simply does not suffice. *See McCarver v. Lee,* 221

shall make a de novo determination of *those portions of the report or specified proposed findings or recommendations to which objection is made.* A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. (Emphasis added). There is no indication that this provision has any less effect when reviewing a report and recommendation in a capital habeas action. Having already rejected the Petitioner's general procedural objection, there are no specific objections to fifteen of the nineteen grounds alleged. As a result, this Court does not need to make a *de novo* review of those claims. *See Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985) ("It does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings.").[4] Therefore, the Magistrate Judge's report and recommendation on Grounds 1, 2, 3, 5, 6, 7, 8, 9, 10, 12, 13, 14, 16, 17 and 18 is affirmed and adopted.

### II. *Procedural Default: Ground 19*

Ground 19 of the petition alleges as follows:

The petitioner was deprived of the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution as a result of counsel's failure to adequately represent petitioner in the guilt and punishment phases of the trial.

F.3d 583, 588 n. 1 (4th Cir.2000) (rejecting § 2254 petitioner's attempt to preserve arguments for appeal "merely by incorporating them by reference in a few sentences in his brief," and affirming the district court's rejection of a similar attempt).

This claim is evidenced by the following facts:

1) Petitioner's counsel were incompetent and too inexperienced to provide effective assistance of counsel....

2) Trial counsel's failure to raise proper objections at trial, advise petitioner of his rights, and contest important matters of law, resulted in petitioner's receiving ineffective assistance of counsel in violation of the Sixth Amendment....

3) Petitioner was deprived of the effective assistance of counsel because of counsel's failure to adequately conduct interviews, investigate, prepare, organize, conceive and execute a theory of defense in the guilt phase of these proceedings....

4) Petitioner was deprived of the effective assistance of counsel because of counsel's failure to adequately conduct interviews, investigate, prepare, organize, conceive and present mitigating evidence in the sentencing phase of the trial....

The Magistrate Judge found that the issues in Ground 19 were procedurally bypassed because they "were not raised on appeal after the denial of the PCR. [Petitioner] makes no argument in his Reply that these claims are exhausted or that he can show cause and prejudice for his failure to properly exhaust." The Petitioner does not dispute that the ineffective assistance claims were not raised in the PCR appeal. Instead, he argues that the failure to raise these issues is a further example of prior counsel's ineffective assistance, that he can show "cause and actual prejudice," and that he can demonstrate a "fundamental miscarriage of justice."

### A. Generally

In general, a federal habeas court may not issue a writ to a state court prisoner where an "adequate and independent" state-law ground justifies the prisoner's detention, even if there is a colorable federal claim. *E.g., Wainwright v. Sykes,* 433 U.S. 72, 81–88, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). One such state-law ground is "procedural default," or the prisoner's failure to fully raise the issue for the state court to consider. *Id.; see Coleman v. Thompson,* 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (procedural default exists where "the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred"); *Weeks v. Angelone,* 176 F.3d 249, 272 & n. 15 (4th Cir.1999); *Kornahrens v. Evatt,* 66 F.3d 1350, 1357–58 (4th Cir.1995). Here, the Petitioner's failure to raise the ineffective assistance issues in appealing the denial of his PCR would prevent this Court from considering the claim in the federal habeas action under the general rule. *See also O'Sullivan v. Boerckel,* 526 U.S. 838, 848, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).

### B. Exceptions

■ There are limited exceptions to this general rule: (1) where the state procedural rule was not "firmly established and regularly followed," *see James v. Kentucky,* 466 U.S. 341, 348, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984); (2) where the prisoner can demonstrate good "cause" for the default and further that he suffered "prejudice" as a result, *see Sykes,* 433 U.S. at 87, 97 S.Ct. 2497; and (3) where the failure to consider the barred claims results in a "fundamental miscarriage of justice," *see Coleman,* 501 U.S. at 750, 111 S.Ct. 2546. These grounds are evaluated under federal law, not state law. *E.g. James,* 466 U.S. at 348–49, 104 S.Ct. 1830; *Schlup v. Delo,* 513 U.S. 298, 314–17, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). The first exception is not implicated here, as the Petitioner makes no argument along these lines.

*1. Cause and Prejudice*

■ The Supreme Court has held that constitutionally ineffective counsel may give rise to sufficient "cause" to require a federal habeas court to review procedurally defaulted claims. *See Murray v. Carrier,* 477 U.S. 478, 488–89, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Thus, the Petitioner argues that the failure of his PCR appellate counsel to raise the ineffective assistance of counsel claims was in itself ineffective assistance of counsel, and is therefore "cause" which would permit this Court to review his claims.

However, to make things more complicated, the Supreme Court has recently held that this second claim of ineffective assistance of counsel is *itself* subject to procedural bar, and if this claim was not properly raised before the state court, it cannot serve as "cause." In *Edwards v. Carpenter,* 529 U.S. 446, 453, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000), the Court held that "an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted." The *Edwards* decision took its reasoning from the *Murray* decision, which notes that "if a petitioner could raise his ineffective assistance claim for the first time on federal habeas in order to show cause for a procedural default, the federal habeas court would find itself in the anomalous position of adjudicating an unexhausted constitutional claim for which state court review might still be available." *Murray,* 477 U.S. at 489, 106 S.Ct. 2639; *see Edwards,* 529 U.S. at 451–52, 120 S.Ct. 1587 (discussing *Murray* ).

The water becomes even more murky with this closing statement by the Court in *Edwards,* 529 U.S. at 453, 120 S.Ct. 1587:

To hold, as we do, that an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted is not to say that that procedural default may not *itself* be excused if the prisoner can satisfy the cause-and-prejudice standard with respect to *that* claim.

Thus, it appears that there could be an exception to the exception, which may not adequately explain the rule. *See id.* at 456–58, 120 S.Ct. 1587 (Breyer, J., concurring in the judgment) ("*Why* should a prisoner, who may well be proceeding *pro se,* lose his basic claim because he runs afoul of state procedural rules governing the presentation to state courts of the "cause" for his not having followed state procedural rules for the presentation of his basic federal claim?"). Under this analysis, federal habeas courts may in some circumstances (such as here, where the only asserted "cause" is ineffective assistance of counsel) be forced to infinitely consider whether there is "cause" for the failure to raise the argument that PCR counsel failed to raise the argument that trial counsel did not raise a particular argument on appeal; nonetheless, this Court is bound by this precedent precisely on point.

From all of this, applied to the case at bar, this Court concludes that Ground 19 (trial and appellate counsel were ineffective) is procedurally defaulted because it was not fully raised and adjudicated on PCR appeal. The Court further concludes that the Petitioner's asserted "cause" for excusing the procedural default (PCR appellate counsel failed to raise the ineffective assistance of trial/appellate counsel) is procedurally defaulted as well because it was not raised on PCR appeal.[5] However, under *Edwards,* if the Petitioner can now

---

**5.** The Court notes that the Petitioner did raise

some issues of ineffective assistance of coun-

establish "cause" for failing to assert the claim giving rise to the underlying "cause"—that is, that PCR counsel failed to argue on PCR appeal that he and trial/appellate counsel were ineffective—the merits of Ground 19 may still be heard.

Unfortunately for the Petitioner, federal law prohibits such a consideration. Pursuant to the statutes governing habeas corpus petitions in capital cases, 28 U.S.C. § 2261(e), "the ineffectiveness or incompetence of counsel during State or Federal post-conviction proceedings in a capital case shall not be a ground for relief in a proceeding arising under section 2254." As the Petitioner's attempt to establish "cause" arises from the Ineffectiveness of PCR counsel to raise certain issues on appeal, this statute prevents it from being raised at all. In addition, the Fourth Circuit has unambiguously held that there is no constitutional right to counsel at the post-conviction relief stage, *see Mackall v. Angelone,* 131 F.3d 442, 449 (4th Cir.1997) (en banc), and, thus, there can be no error which implicates the Sixth Amendment.

There being no established "cause," this Court may not consider whether the Petitioner was "prejudiced." *See Kornahrens v. Evatt,* 66 F.3d at 1359 ("We are mindful, however, that in *Engle [v. Isaac,* 456 U.S. 107, 134 n. 43, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982) ], after finding that there was no cause for the default, the Supreme Court ended its inquiry, noting that because 'we conclude[d] that these respondents lacked cause for their default, we do not consider whether they also suffered

actual prejudice.' ") (alteration by *Engle* court); *Breard v. Pruett,* 134 F.3d 615, 620 (4th Cir.1998) (same). Thus, Ground 19 may not be considered on the merits under the "cause and prejudice" standard.

## 2. Fundamental Miscarriage of Justice

■ The final consideration in whether the Court may reach the merits of Ground 19 is whether the failure to review it would constitute a "fundamental miscarriage of justice." *See Coleman,* 501 U.S. at 750, 111 S.Ct. 2546. This term has been uniformly interpreted to mean that the Petitioner must prove "actual innocence." *See Sawyer v. Whitley,* 505 U.S. 333, 338–350, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992) (citing a history of prior decisions); *Weeks v. Angelone,* 4 F.Supp.2d 497, 507 (E.D.Va. 1998), *appeal dismissed,* 176 F.3d 249 (4th Cir.1999).

> To meet the miscarriage of justice exception, the petitioner must show that a constitutional violation has probably resulted in the conviction of one who is actually innocent. *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Those petitioners who are sentenced to death may also meet the exception by showing through clear and convincing evidence that but for a constitutional error, no reasonable juror would have found him eligible for the death penalty. *Sawyer,* 505 U.S. at 336, 112 S.Ct. 2514.

*Weeks,* 4 F.Supp.2d at 510.[6] In considering the applicability of the death penalty,

---

sel in his appeal of the PCR decision. However, these ineffective assistance claims were of a very specific nature, unrelated to any of the claims raised in Ground 19 or the alleged "cause" for the failure to raise Ground 19. In fact, some of the ineffective assistance grounds asserted on PCR appeal are separately raised and discussed on the merits in the Magistrate Judge's report and recommenda-

tion, and will be considered on the merits herein.

**6.** The *Schlup* opinion drew a distinction between cases in which a petitioner "advanced his claim of innocence to support a novel substantive constitutional claim, namely, that the execution of an innocent person would violate the Eighth Amendment," 513 U.S. at 314, 115 S.Ct. 851, and cases such as that at

petitioners must focus "on those [objective] elements which render a defendant eligible for the death penalty, and not on additional mitigating evidence which was prevented from being introduced as a result of a claimed constitutional error." *Id.* at 512 (quoting *Sawyer,* 505 U.S. at 347, 112 S.Ct. 2514).

In his objections, although the Petitioner asserts that there has been a fundamental miscarriage of justice, he cites none of the above authority and makes no specific argument relating to the standard of law. Many of the specific claims urged by Petitioner in Ground 19 concern the failure to present mitigating evidence or the manner in which such evidence was presented in the sentencing phase. Under *Sawyer,* this is improper. 505 U.S. at 347, 112 S.Ct. 2514. In addition, many of the specific claims deal with issues not directly related to the Petitioner's guilt or innocence, or to his eligibility for the death penalty. *See Weeks,* 4 F.Supp.2d at 513 ("Weeks must show that he was actually ineligible for the death penalty under Virginia law, so that barring the constitutional error, no reasonable juror would have sentenced him to death").

Under South Carolina law, a jury must find the existence of one or more elements from a list of aggravating circumstances for a defendant to be eligible for the death penalty. S.C.Code § 16–3–20(C)(a). In the present case, the State presented evidence and the jury found that the murders were committed while in the commission of

kidnaping, § 16–3–20(C)(a)(1)(b), while in the commission of robbery while armed with a deadly weapon, § 16–3–20(C)(a)(1)(d), and that two or more persons were murdered pursuant to a common plan or scheme, § 16–3–20(C)(a)(9). In cases where more than one aggravating circumstance is found, "the jury's reliance on an invalid aggravating factor may not 'infect the formal process of deciding whether death is an appropriate penalty' if the jury also 'finds at least one valid aggravating factor.'" *Smith v. Moore,* 137 F.3d 808, 815 (4th Cir.1998) (citation omitted) (applying South Carolina law). The jury's reliance on other invalid aggravating factors is not fatal so long as the invalid evidence does not have a "substantial and injurious effect and influence on the jury's verdict." *Id.* (citing *Tuggle v. Netherland,* 79 F.3d 1386, 1391–92 (4th Cir.1996)).

In asserting Ground 19, the Petitioner does not argue exactly how the ineffective assistance of counsel affected the jury's findings with respect to each of the three found aggravating factors, or how the ineffective assistance affected the jury's findings with respect to guilt or innocence. Some of the alleged errors occurred in conjunction with other alleged grounds for relief, and will be discussed separately herein. In general, however, the Petitioner's lengthy recitation of trial counsel's alleged lack of experience and qualification fails to adequately and specifically demonstrate that the jury's guilty verdict or findings regarding aggravating circumstances

---

issue, in which the "constitutional claims are based not on his innocence, but rather on his contention that the ineffectiveness of his counsel ... denied him the full panoply of protections afforded to criminal defendants by the Constitution," *id.* The Supreme Court rejected the "but for" test announced in *Sawyer* where the "claimed injustice is that constitutional error has resulted in the conviction of one who is actually innocent of the crime." *Id.* at 324, 115 S.Ct. 851.

However, the *Schlup* decision did not Invalidate *Sawyer*'s holding that the "but for" standard applies in cases where the actual innocence issue focuses on the application of the death penalty, what the Court called "innocent of death." *Sawyer,* 505 U.S. at 341, 112 S.Ct. 2514. *See Weeks,* 4 F.Supp.2d at 514 (drawing this same distinction). Hence, there are two separate considerations for "fundamental miscarriage of justice" in the context of a prisoner sentenced to death.

would have been different. Likewise, the several specific examples of experts who should have been retained, witnesses who should have been interviewed, lines of questioning which should or should not have been pursued, and investigations which should have been made, do not support the contention that the Petitioner did not commit the crimes or that none of the aggravating circumstances were present. In sum, even assuming that counsel did make errors, the Petitioner has failed to adequately prove that these errors were of a constitutional magnitude, that they "probably resulted in the conviction of one who is actually innocent," *Schlup*, 513 U.S. at 326, 115 S.Ct. 851, or that "no reasonable juror would have found him eligible for the death penalty," *Sawyer*, 505 U.S. at 350, 112 S.Ct. 2514.

Two particular arguments might possibly satisfy the above standard. The first is the combined claims that trial counsel failed to investigate the Petitioner's assertion that he neither knew nor worked with the victims in this case, and that the Chief Deputy Sheriff investigating the murders may have been biased against him because Petitioner had previously fired the Chief Deputy's son from a job. However, even giving the Petitioner the benefit of the doubt and assuming both of these claims to be true, the Court is simply unconvinced that this satisfies the "probably resulted" standard. *See Schlup*, 513 U.S. at 326, 115 S.Ct. 851. There was simply too much evidence regarding guilt and the aggravating circumstances, including the Petition-

er's own statement,[7] witnesses placing Rocheville and the Petitioner's van at the theater, witnesses seeing Rocheville searching Greene's car, the large-caliber weapon found inside the Petitioner's father's car (which the Petitioner drove to the restaurant where he was arrested), the recently-fired shell casings found inside his residence, the large sum of cash found inside a coat within the father's car, and Hopps' blood type found on the Petitioner's clothing.

The second claim which could raise constitutional issues is the trial judge's instruction regarding the scope of cross-examination should the Petitioner choose to testify.[8] The Petitioner claims that the trial judge erred in telling him that, if he took the stand, he would be subject to cross-examination "on any matters regarding [his] personal background, and all matters involved in this case." Assuming, without deciding, that the Petitioner is correct that this was an improper instruction, the Court cannot conclude that this provides proof that the jury's verdict or findings at sentencing would be different, under any standard of proof. The Court agrees with the Magistrate Judge and with the PCR court that trial counsel, by his own testimony, discussed the right to testify with the Petitioner on several occasions prior to trial, and that counsel and the Petitioner had agreed prior to trial that the Petitioner would not make a good witness and, therefore, should not testify. There is no concrete evidence that an erroneous instruction regarding the scope of

---

7. The Court will discuss the Chief Deputy's "interpretation" of a particular phrase used by the Petitioner during his statement under Ground 4. It should be noted, however, that the Petitioner does not object to the admissibility or validity of his entire statement; he only objects to this one aspect.

8. This was raised by the Petitioner as Ground 17 of his petition, but the Petitioner did not

specifically object to the Magistrate Judge's recommendation that this claim be dismissed on the merits. However, because the Court is determining whether a fundamental miscarriage of justice would result in not hearing his claims of ineffective assistance, the Court finds that a limited review of this claim is warranted.

cross-examination actually affected the Petitioner's trial strategy in any way, or consequently any verdict or finding. *See Schlup,* 513 U.S. at 326, 115 S.Ct. 851.

In sum, the Petitioner has failed to demonstrate that a "fundamental miscarriage of justice" would result if the Court did not consider the merits of his procedurally defaulted claims of ineffective assistance of counsel. Therefore, the Petitioner's objections on this issue are overruled, and the Magistrate Judge's report and recommendation is affirmed.

## III. Exculpatory Sentencing Evidence: Ground 15

The Petitioner argues in Ground 15 that "the State failed to disclose to Petitioner or his counsel exculpatory evidence material to the issue of punishment, including evidence of remorse and prior inconsistent statements, in violation of due process." Specifically, the Petitioner claims that, during post-conviction discovery, "it was learned that in his confession to the police, the petitioner did express remorse for the murders," in apparent contradiction to the testimony at trial.

This claim was raised in the Petitioner's PCR application, rejected on its merits, and listed in the petition for certiorari to the Supreme Court of South Carolina; thus, it is properly before this Court. As noted previously, the standard for reviewing claims on the merits under 28 U.S.C. § 2254(d) is as follows:

> a federal court may grant an application for habeas relief on a claim that has been previously adjudicated on the merits in state court only if that adjudication '(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.' The Supreme Court has directed that "[u]nder § 2254(d)(1)'s 'unreasonable application' clause ... a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable."

*Bell v. Ozmint,* 332 F.3d 229, 233 (4th Cir.2003) (quoting *Williams v. Taylor,* 529 U.S. 362, 411, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (alterations by the *Bell* court)). With this standard, the Court reviews the Petitioner's claim of error.

Upon questioning the Petitioner after his arrest, at least three law enforcement officers were present to hear the Petitioner's statement. Detective Mike Creek testified at trial that the Petitioner said that he did nothing to stop Rocheville from shooting Alex Hopps, even though he could have done something to stop Rocheville. In a post-conviction discovery deposition, Creek recalled that during his statement the Petitioner "was real concerned for his family, for the embarrassment, particularly his sister, I think it was a younger sister. He seemed real concerned about that."

Captain Mike Ennis testified at trial that the Petitioner refused to sign his statement without a lawyer being present. At a post-conviction deposition, Ennis testified that the Petitioner "was making a statement to the effect that this never should have happened, that they worked with the boys, that basically they never should have done what they did." Ennis further stated that the Petitioner "did more or less make an apologetic statement for what happened, and that statement was something to the effect, and again I

can't be specific, but I remember him making some statement to the effect that it never should have happened, that they never should have done that, that they worked with those two boys and they shouldn't have done what they done [sic]."

The Petitioner also made this "very dramatic statement," according to Chief Deputy Sheriff James Murray, who testified at trial: "My God, we killed those kids for fifteen hundred dollars." At a post-conviction discovery deposition, Murray testified that "based on what he said and the way he acted, I would, yeah, I think he was remorseful that it happened."

The Petitioner claims that the combined effect of these three statements demonstrates that he expressed remorse over the murders, and that the jury was never informed of this remorse, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. He asserts that, had the jury been able to consider this evidence, there is a "reasonable probability" that either the trial or the sentence would have been different. The PCR court and the Magistrate Judge rejected this claim, finding that the only material not heard by the jury were the individual witnesses' "impressions" of the Petitioner's demeanor, which are not covered under the *Brady* line of cases.[9]

The *Brady* decision holds that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83

S.Ct. 1194. Later decisions enhanced this rule, by extending it to draw no distinction between exculpatory and impeaching evidence, to hold that no request has to be made for such information, and that evidence favorable to an accused is "material" and suppression by the government causes constitutional error "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *see Kyles v. Whitley*, 514 U.S. 419, 433–34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (giving history of *Brady* line).

■ Moreover, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 438, 115 S.Ct. 1555. This includes material known only to the police and not to the prosecutor. *Id.* This "illustrate[s] the special role played by the American prosecutor in the search for truth in criminal trials." *Strickler v. Greene*, 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Id.* at 281–82, 119 S.Ct. 1936. With regard to prejudice, "the question is not whether the defendant would more likely than not have received a different

---

9. The Magistrate Judge also considered a "box of notes compiled by the Solicitor's Office in preparation for trial," containing the Solicitors' "handwritten notes, juror information, correspondence, appellate briefs, newspaper articles, photographs ... and SLED reports." The Magistrate Judge concluded that "review of this material sheds no further light on this issue," and ordered the material to be entered into the record of this Court under seal. The Petitioner does not make specific objection to the finding that this material is not relevant to the issue, and the Court will therefore make no comment upon this evidence.

verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555 (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375).

As noted by the Magistrate Judge, the Petitioner does not cite any authority for the proposition that the one person's mental impressions concerning another person's demeanor while making a statement are covered under *Brady;* rather, the Petitioner generally assumes that such information is covered under *Brady* unless it is specifically removed from its scope. He claims that such evidence is *Brady* material under the theory that a defendant's expression of remorse is a fact to be considered by the jury and that a lay person's opinion, perception or inference of another person's state of mind is permissible under Rule 701 of the South Carolina Rules of Evidence.

 Assuming for the moment that evidence of remorse is favorable to the Petitioner and material to the issue of punishment, the Petitioner can demonstrate neither that the Government suppressed the evidence nor that it was prejudicial. This is primarily because the defense was informed and the jury heard that the Petitioner said, "My God, we killed those kids for fifteen hundred dollars." It is this statement which gave rise to the various law enforcement officials' perception that the Petitioner was remorseful. There was no surprise that Murray was going to say this, and there was no surprise that this statement could be taken as one of remorse. In fact, the Petitioner's counsel even *asked* Murray on cross-examination whether he took this statement to be one of remorse, to which

Murray indicated he did not know exactly what the Petitioner meant.

This is not the type of evidence for which the *Brady* line of cases was intended. The majority of *Brady* cases concern the prosecution's knowledge and/or possession of evidence which *directly contradicts* inculpatory evidence presented at trial. *See Strickler,* 527 U.S. at 282, 119 S.Ct. 1936 (contrasting a "terrifying incident" related to the police with the witness' initial perception that it was "a trivial episode of college kids carrying on"); *Kyles,* 514 U.S. at 442–43, 115 S.Ct. 1555 (contrasting witness testimony on the size and build of the perpetrator with statements taken at the scene which were "vastly different"); *Giglio v. United States,* 405 U.S. 150, 152–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (contradictory statements by a prosecutor as to whether he promised the defendant not to prosecute him if he cooperated). This is completely unlike the situation at bar, where a statement which could objectively be considered a statement of remorse was admitted at trial for the jury's consideration, but evidence that the law enforcement officers interviewing the speaker thought he may have been remorseful was not discussed.

Moreover, the Petitioner's interpretation of *Brady* is not consistent with the established standard of review under § 2254. Contrary to his assertions, it is the *Petitioner* who must demonstrate that the state court's decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." To assume that mental impressions of others' intent fall under *Brady,* without some authority to support it, misunderstands the nature of § 2254 proceedings. From a review of the cases, neither this Court nor apparently either party has discovered

United States Supreme Court cases dealing with the applicability of *Brady* to one person's mental impressions of another person's demeanor or intent while making a statement, particularly where the statement is admitted into evidence. There being no "clearly established" federal law on this precise point, the Court cannot conclude that the state court was in error.

In addition, it was not unreasonable for the PCR court to conclude that the evidence of remorse, even if believed, would have affected the proceedings. In *Jones v. Cooper*, 311 F.3d 306, 315 (4th Cir.2002), the petitioner challenged the prosecution's failure to produce jail logs and testimony of a jailer who testified at the PCR level that he believed the petitioner to be remorseful when overheard speaking by telephone to his grandfather. The Fourth Circuit summarily rejected this argument, finding as follows:

> Appellant had recently been captured and interrogated throughout the morning. An individual might very well sound as if he were remorseful at this time due to a newfound appreciation for the consequences of his action, and the exhaustion caused by being awake and subject to interrogation for an extended period.

In the present case, both Ennis and Murray testified that the Petitioner's remorse, if believed, could be the result of his being arrested. Murray indicated at his PCR deposition that "it's hard to read into someone's actions, how they're feeling at the time they do it. So, it's just my perception and interpretation. He may have just been mad that he got caught. I don't know." Likewise, Ennis noted in his PCR deposition that the remorse the Petitioner expressed could have had another purpose:

> I took it when he made that statement that as far as him actually feeling that way, I think that he did realize that this

was wrong, that they made a bad mistake and that they really shouldn't have done what they done [sic], but I think that it was more coming from him at that time, as best I can remember, something more. It was more along the lines of the right thing to say as opposed to him really feeling remorseful and guilty and that sort of thing over what they had done.

Given this interpretation and the fact that the Petitioner was arrested less than 20 hours after having been involved in the murders, it is just as likely that the strain of interrogation and the "newfound appreciation for the consequences of his action" gave rise to whatever remorse was expressed. *See Jones*, 311 F.3d at 315.

In sum, there has been no showing by the Petitioner which leads to the conclusion that the state court has violated any "clearly established federal law," that there is a "reasonable probability" that the "result of the proceeding would have been different," *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375, or that the government's suppression of this evidence " 'undermines confidence in the outcome of the trial.' " *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555 (quoting *Bagley*, 473 U.S. at 678, 105 S.Ct. 3375). Accordingly, this claim is rejected.

### IV. Mistrial Based on False Statement: Ground 4

██ In Ground 4, the Petitioner alleges that Chief Deputy Sheriff James Murray "testified to an undisclosed and false statement attributable to the petitioner," and that the trial court's failure to declare a mistrial is constitutional error. Specifically, the Petitioner argues that Murray's statement at trial that the Petitioner "knew what was going to happen" was unfairly prejudicial because no such statement or similar statement was known by the defense prior to trial.

This argument was presented both in direct appeal and during the state PCR action, and was listed in the petition for certiorari on PCR appeal. This claim is therefore properly before the Court, and is to be reviewed under the "clearly established" and "unreasonable application" standards of § 2254.

Chief Deputy Murray was one of several law enforcement officers present when the Petitioner gave his statement. At trial, after the Petitioner's statement was introduced into evidence via Murray (who took notes of the interview), the Solicitor asked Murray if he recalled anything else not already related in his testimony:

A: Yes, sir, I do recall at one point during the interview he said that something to the effect that no one was suppose [sic] to be killed or was not intended that anyone get killed.

Q: Uh-huh. (Affirmative)

A: And, and one other thing that, that he had mentioned was that when he had taken Alex [Hopps] outside and put him over the bar, he observed Rocheville raising the gun up to Alex's head, and he did nothing to stop him. He just watched him.

Q: Who did nothing to stop him?

A: Longworth did nothing to stop him.

Q: Did he say he knew what was happening?

A: He said he knew what was going to happen.

Q: All right, sir.

A: But he did nothing to stop him.

The defense immediately objected on the grounds that they had no prior knowledge that Murray was going to testify that the Petitioner had advance knowledge that Hopps was going to be killed. The trial judge sent the jury out of the courtroom and interrogated Murray at length on this subject:

THE COURT: And where in his conversation with you was the defendant when he said he knew what was going to happen? Was it when they took Mr. Hopps outside?

WITNESS: As, as he was explaining, right, when they took him outside, and, and bent him over the bar.

THE COURT: Okay. But it was not in relation to anything that may of [sic] happened to Mr. Greene?

WITNESS: No, sir.

THE COURT: Okay. Well, it would appear, Mr. Johnston [defense counsel], that it is no more than a different phrasing of what you'd already had.

MR. JOHNSTON: Your Honor, perhaps I, there's a misunderstanding as to what I interpreted what Chief Murray said. Perhaps I'm wrong. But the way I interpreted it was he knew what was going to happen in reference to the gun being pointed at him and it being shot.

. . .

MR. JOHNSTON: And I think that's an, a different, an additional statement to the [sic] I saw the gun, and I did nothing to stop it.

THE COURT: It clearly is a great deal more than merely I saw the gun and did nothing to stop it.

MR. JOHNSTON: Yes, sir. And of course, it's not written anywhere.

THE COURT: And solicitor, the problem is you, of course, are under an obligation to tell him these things. Why didn't you tell him?

SOLICITOR GOSSETT: Your Honor, I, I just asked him the question, and didn't know exactly how he was gonna phrase it, and basically he quoted what he phrased it in, in his paraphrasing.

THE COURT: Well, no, I didn't take it as a paraphrase. I took it as a quote from the defendant.

SOLICITOR GOSSETT: Well, I -

THE COURT: Did you paraphrase?

WITNESS: No, sir, that was not a quote. No, sir, that was a paraphrase. That wasn't a quote per se.

THE COURT: Oh, then it is, it is error that he said he knew what was going to happen?

WITNESS: Is what?

THE COURT: That he, he said—I understand you to say he said he knew what was going to happen.

WITNESS: He said he saw Rocheville or yeah, Rocheville point the weapon, and he felt he knew what, what was gonna happen. But he did nothing to stop it.

THE COURT: Then your, your comment thereafter is, is just a, a, you've just embellished what he said? You've added an interpretation to what he said, is that, is that accurate?

WITNESS: Well, not to what he said. Maybe the way it was said. It's, it's, it isn't a quote per se. But he did say he saw Rocheville point the weapon at him. He felt he knew what he was gonna do. But he did nothing to stop it. That's pretty much what—

THE COURT: Okay. Now, see that's the third different one we got. We knew that, that he was gonna say that, that he had said I saw Rocheville with the gun, and I did nothing to stop him.

THE WITNESS: Okay, sir.

THE COURT: Okay. Now, do I understand that all of your, your, your interpretations after that are what you interpret or what he said?

THE WITNESS: No. it's what he said. But not verbatim.

THE COURT: Well, sir, you know there's a, there's a world of difference between saying I saw Rocheville and I did nothing to stop him.

WITNESS: Yes, sir.

THE COURT: And I knew what was going to happen.

WITNESS: He made that statement.

THE COURT: All right, sir. That's what I want to know.

WITNESS: Yes, sir.

THE COURT: Did he make that statement?

WITNESS: Yes, sir, he made that statement he did not know what was or he knew what was going to happen. But he did nothing about it.

· · ·

THE COURT: ... I want to know this now, Chief Murray, and this is—

WITNESS: Yes, sir.

THE COURT:—this is really really prejudicial. Did he say I knew what was gonna happen or is that your interpretation of the statement the solicitor just made?

WITNESS: I think that from what he said that was my interpretation of what he meant.

THE COURT: Then, he did not say I knew what was going to happen?

WITNESS: It's very difficult to remember exactly what, what the words were that he said right now.

THE COURT: Well, would you agree that seeing Rocheville with the gun and doing nothing to stop him—

WITNESS: No, I'd say—

THE COURT:—is less prejudicial than I knew what was going to happen?

WITNESS: I, I tend to think if, if I'd have to rely on my notes. What my notes said, that's the accurate description of what happened there.

THE COURT: Your notes, the ones you have there—

WITNESS: Yes, sir.

THE COURT:—say what about he knew what was going to happen? Now, I'm not, I don't want your interpretation of what he said. I need to know what he said. The jury has to deal with that.

Your interpretation is a little different from what, what the man said.

WITNESS: Okay. It, it, my notes do not contain that, that remark.

THE COURT: And that is an inaccuracy?

WITNESS: What, sir?

THE COURT: What you have said that that comment was not made by the defendant?

WITNESS: If it were made, I do note have it in my notes.

THE COURT: And is it no more than your interpretation?

WITNESS: I would have to say that that is probably accurate.

The court then undertook a review of the record, and concluded that the statement at issue "does not rise naturally from [what was said], and I'm gonna tell the jury that, that he did not say that. Because the testimony as offered by Chief Murray is that he said that." The Petitioner made a motion for mistrial, and the court indicated that this is what it "wanted [him] to do." The court then denied the motion, choosing instead to "cure it with my comments to the jury." The court then brought the jury in and instructed them as follows:

THE COURT: Now, Mr. Foreman, and ladies and gentlemen, the, during the testimony that was being presented, the defense counsel objected properly. You had heard testimony from the statement by Chief Murray that the defendant says [sic] I saw Rocheville with the gun, and I did nothing to stop it. That's part of the statement. The solicitor went on to say did Longworth say I knew what, he knew what was going to happen. And Chief Murray says [sic] yes, he says he knew what was going to happen. And that's not true. And that's not in the statement.

And I have conferred with Chief Murray here in this courtroom on the rec-

ord. And that is his interpretation. That is not a statement by the defendant. I must ask you to disregard that, to wipe that comment from your mind. It is improper [sic] thing to be injected into this trial, and you disregard it entirely please. It is so important.

The only statement made was I saw Rocheville, and I did nothing to stop him. And that's the end of it as best I can tell. Disregard anything further from Chief Murray on that point as I have outlined to you. All right. Thank you.

The Supreme Court of South Carolina, on direct appeal, found that the solicitor was surprised by Murray's testimony, and that "the curative instruction was clearly sufficient to ensure the jury did not attribute Chief Murray's statement to appellant." *State v. Longworth*, 438 S.E.2d at 225. Over the Petitioner's objection, the Supreme Court went on to hold that "even if the jury could have inferred from the trial judge's instruction that Chief Murray's 'interpretation' was valid, we find no prejudice," because under accomplice liability "it is immaterial whether appellant knew before hand that Rocheville was going to shoot Hopps." *Id.* (citing *State v. Bell*, 305 S.C. 11, 406 S.E.2d 165 (1991)). The court further held, "nor is such knowledge material to imposition of the death penalty under the law set forth in *Tison v. Arizona*, [481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) ]."

The state PCR court determined that there was no prosecutorial misconduct, because that issue was raised and rejected on direct appeal. The PCR court further concluded that there was "no showing of the use of 'perjured' testimony by the prosecution." The PCR court accepted Chief Murray's statement at the PCR hearing that his trial testimony was "to the best of his ability truthful." There was evidence

that the solicitor, in preparing for trial, discovered that the Petitioner may have said something to this effect, but told Murray to *stay away* from this area because this statement did not appear in Murray's notes of the interview and may not be admissible. However, when the solicitor specifically asked at trial, "Did he say he knew what was happening?," Murray said he "just answered it truthfully;" thus, the PCR court determined, there was no false statement.

Finally, the PCR court found no *Brady* violation for failing to turn the statement over to the defense, because it decided that including the testimony, along with the judge's curative instruction, did not call the verdict or sentence into question, created no "reasonable probability" that the result of the proceeding would have been different, and generally caused no "prejudice" which would violate due process. The Magistrate Judge, after quoting the PCR court's findings, concluded that "these finding are fully supported by the record." [10]

In his objections, the Petitioner argues that the PCR record demonstrates that the solicitor did in fact have advance knowledge of the statement, and was not surprised as the Supreme Court held on direct appeal. Solicitors Gossett and Pruett testified that they met with Chief Murray and Sheriff Coffey about a week before the trial to discuss the case. Pruett noted that there might be an "obstacle" in

imposing the death penalty on Longworth because of the case of *Enmund v. Florida,* 458 U.S. 782, 797–99, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), which holds that an accomplice, aider or abetter must know that a killing was going to take place, or otherwise intended for a killing to take place, in order for the death penalty to be imposed. It was at this point, according to Pruett, that Chief Murray raised the fact that the Petitioner said "something like" he knew what was going to happen, despite repeated requests for direct quotes not contained in the written statement or the notes of the interview.

Pruett explained that, although such testimony would indeed be incriminating, it could not be used because it was not recorded in any manner prior to that point and because Murray's recollection was "vague." When asked why the statement was not turned over to the defense, Pruett indicated that he did not believe this particular recollection by Murray was "credible and reliable." In fact, Pruett says he told Murray to say "no" if asked about it at trial, a fact Murray denied in his own PCR testimony. Gossett was aware of these meetings, as he was present when the above conversations took place. Murray testified at the PCR hearing that he did not recall the solicitors telling him to say "no" if asked about the Petitioner's foreknowledge, and would not have done

---

**10.** This issue is somewhat related to the arguments presented in Ground 15 above. The Petitioner asserts that there is an irreconcilable conflict in the findings that, under Ground 15, Murray's and Ennis' impression or interpretation of the Petitioner's demeanor when he made the statement was properly not turned over and admitted into evidence, whereas under Ground 4 there was no error in allowing the jury to hear Murray's interpretation of the Petitioner's statement.

There is, however, an important distinction between the two situations, namely the nature

of the evidence at issue. On the one hand is potentially *exculpatory* evidence, judged under the *Brady* line of cases; on the other hand is allegedly false or misleading *inculpatory* evidence, which is governed by related but distinct standards. *See infra.* In any event, when reviewed under the common question of whether the admission or non-admission of the evidence would likely have affected the judgment or called the verdict into question, the conclusion is the same: it would not.

so even if asked, because it would have constituted perjury.

The Petitioner asserts that Gossett, when examining Murray at trial, "was requesting either a perjured response or a response which Gossett and Pruett had previously determined to be inaccurate, unreliable and not credible," either of which constitutes prejudice. He claims that the statement was indeed "false," because the trial court found that it was not a statement made by the Petitioner, and that this Court should give this finding the deference it is due under § 2254(e). Finally, the Petitioner maintains that the statement prejudiced the consideration of sentence, because it "made [him] appear more culpable for the crime than he actually was," and because the judge's curative instruction "did not preclude the jury from reaching the same 'interpretation' of Officer Murray's assertion."

The Fourth Circuit, in *Boyd v. French,* 147 F.3d 319 (4th Cir.1998), clearly outlined the standard for examining perjured testimony.

A conviction acquired through the knowing use of perjured testimony by the prosecution violates due process. *See Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). This is true regardless of whether the prosecution solicited testimony it knew to be false or simply allowed such testimony to pass uncorrected. *See Giglio v. United States,* 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue,* 360 U.S. at 269, 79 S.Ct. 1173. And, knowingly false or misleading testimony by a law enforcement officer is imputed to the prosecution. *See Wedra v. Thomas,* 671 F.2d 713, 717 n. 1 (2d Cir.1982); *Curran v. Delaware,* 259 F.2d 707, 712–13 (3d Cir.1958) (citing *Pyle v. Kansas,* 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942)); *cf. Boone v. Paderick,* 541 F.2d 447, 450–51 (4th Cir.1976) (recognizing that withholding of exculpatory evidence by police is imputed to the prosecution). *But see Koch v. Puckett,* 907 F.2d 524, 530–31 (5th Cir.1990) (rejecting habeas petitioner's claim that sheriff and investigators testified falsely at trial on the basis that petitioner had failed to show that the prosecutor knew the testimony was perjurious). As this court has explained:

The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure. If police allow the State's Attorney to produce evidence pointing to guilt without informing him of other evidence in their possession which contradicts this inference, state officers are practicing deception not only on the State's Attorney but on the court and the defendant.

*Barbee v. Warden, Md. Penitentiary,* 331 F.2d 842, 846 (4th Cir.1964) (footnote omitted). The knowing use of perjured testimony constitutes a due process violation when " 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *Kyles v. Whitley,* 514 U.S. 419, 433 n. 7, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)); *see United States v. Ellis,* 121 F.3d 908, 915 n. 5 (4th Cir.1997); *United States v. Kelly,* 35 F.3d 929, 933 (4th Cir. 1994).

147 F.3d at 329–30 (parallel citations omitted). "A defendant seeking to vacate a conviction based on perjured testimony must show that the testimony was, indeed, perjured. Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." *United States v. Griley,* 814 F.2d 967, 971 (4th Cir.1987) (citations omitted).

If the Court were to assume that Gossett asked Murray to give a false or knowingly inaccurate and unreliable statement, there can be no prejudice because Murray's testimony, from his perspective as the witness, was not "knowingly false." Murray told what he believed to be the truth—i.e., that from the context of the Petitioner's statement, the Petitioner knew what was going to happen—even in the face of being told by the solicitors to deny it. Taken in its worst light and construed as an *attempt* by the State to suborn perjury, the fact that Murray failed to lie and his answer was not "knowingly false" dispenses with the argument.

That the trial court found the statement to be inadmissible at trial does not necessarily mean that the statement was "false." The judge's ruling was not that Murray lied about what the Petitioner said, but rather that Murray improperly placed his own interpretation onto the words spoken by the Petitioner. There is a clear distinction between (1) knowing a statement was not made but testifying that it was made, and (2) honestly believing that the statement was implicit in the words spoken but, because it was based on interpretation, the statement is inadmissible. *Cf. United States v. Bakker*, 925 F.2d 728, 738 (4th Cir.1991) (affirming jury instruction noting that "One who expresses an opinion honestly held by him is not chargeable with fraudulent intent even though his opinion is erroneous or his belief mistaken. And, similarly, evidence which establishes only that a person made a mistake in judgment or an error in management or was careless does not establish a fraudulent intent.").

Moreover, the Court agrees with the PCR court and the South Carolina Supreme Court that whatever prejudice could have arisen from the "misleading" nature of Murray's statement was more than adequately cured by the trial judge's curative instruction to the jury. The jury was specifically instructed to "disregard that, to wipe that comment from your mind. It is improper [sic] thing to be injected into this trial, and you disregard it entirely please." No clearer instruction could have been given, and there is no evidence that the jury failed to follow this instruction. *See State v. Longworth*, 438 S.E.2d at 225 ("An instruction to disregard incompetent evidence is usually deemed to cure any error in its admission.") (citing *State v. Dawkins*, 297 S.C. 386, 377 S.E.2d 298 (1989)).

Finally, the Court rejects the Petitioner's assertion that the trial judge was required to completely bar the jury from taking a negative inference from any of Murray's statement. Murray had already properly testified that the Petitioner said "he observed Rocheville raising the gun up to Alex's head, and he did nothing to stop him." From this and all the other evidence presented at trial, even without the disputed statement, any reasonable juror could infer that the Petitioner was a "substantial" participant in the crimes and acted with "reckless disregard for human life," which is an appropriate factor to consider in applying the death penalty to a non-trigger defendant. *Tison v. Arizona*, 481 U.S. 137, 157–58, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (expanding the *Enmund* decision to hold that "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result").[11] Because the state-

11. The trial judge's instructions to the jury at sentencing were in relevant part as follows:

Now, ladies and gentlemen, the Constitution of our country and our state forbids the

ment was not false or knowingly misleading, and because even if the statement *were* false or misleading, there would have been no "reasonable likelihood" that it "could have affected the judgment of the jury," the Petitioner's argument is rejected. *See Kyles,* 514 U.S. at 433 n. 7, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)); *Boyd,* 147 F.3d at 330; *Monroe v. Angelone,* 323 F.3d 286, 316 (4th Cir.2003).[12]

## V. Conflict of Interest: Ground 11

The final, and most strenuously argued, ground for relief asserted by the Petitioner is Ground 11, in which the Petitioner argues that one of his trial counsel possessed a conflict of interest because he was "actively representing" the Petitioner's parents, and thereby sought to represent their interests as well as his. Due to this conflict, the Petitioner argues, counsel failed to adequately develop evidence of

the Petitioner's difficult past as mitigating evidence at sentencing.[13]

This argument was raised in the PCR application, in the petition for certiorari to the South Carolina Supreme Court on the denial of the PCR, and in the petition for certiorari to the United States Supreme Court on the denial of the PCR. It is thereby properly before the Court, and subject to the "clearly established" and "unreasonable application" standard of § 2254. *See supra,* discussion of § 2254.

### A. Powell's Representation

According to the Petitioner and his father, an investigator from the Spartanburg County Office of the Public Defender initially visited the Petitioner a "couple of weeks" after his arrest, and a file was opened in that office for the Petitioner's case. However, on February 15, 1991, the Petitioner's parents (Richard H. ("Dick") Longworth and Barbara K. Longworth) entered into a "contract for legal represen-

imposition of the death penalty upon one who did not personally take life or attempt to take life or intend that life be taken. Therefore, I will tell you that the death penalty can not [sic] be imposed on one who aids and abets in a crime in the court of which a murder is committed by another. But who did not himself kill, attempt to kill, or intend that a killing take place, or that lethal force, force be used by another.

Stated differently, before you can recommend this defendant be sentenced to death, you must first find beyond any reasonable doubt at least one of the statutory aggravating circumstances I have read to you, and at least one of these three criteria. That this defendant did kill a victim or that if this defendant did not kill a victim, then he intended that the victim be killed by another or that if he did not kill a victim, that he intended that legal force be used by another.

Major participation by a defendant in the commission of a felony, combined with reckless indifference to human life, may be considered by you as you determine the defendant's intent in this case. If you find

beyond any reasonable doubt that at least one of the alleged statutory aggravating circumstances existed at the time a victim in this case was murdered, and the existence of one of these three criteria I have read to you, then you would be authorized to recommend that the death sentence be imposed upon this defendant.

12. The Court also notes that, to the extent the Supreme Court of South Carolina may have erred in addressing the *Tison* issue, *see* 438 S.E.2d at 225, there was sufficient evidence for the jury to otherwise conclude that the death penalty was proper.

13. The Petitioner originally argued that this conflict infected both the guilt and sentencing phases of the trial, but he only objected to and made specific argument on the sentencing aspect of the case. As noted previously, this Court is only required to address issues specifically raised in objections, *see* 28 U.S.C. § 636(b), and the Petitioner cannot merely incorporate previous arguments by reference, *see McCarver v. Lee,* 221 F.3d 583, 588 n. 1 (4th Cir.2000).

tation," whereby attorney Hubert H. Powell, Jr. ("Powell") was retained "to represent and defend our adult son, Richard W. Longworth, for criminal charges" extending out of the instant indictments. The same day, the Petitioner signed an "affidavit and acknowledgment," certifying that he understood that his parents had hired Powell as his attorney. The Petitioner's father stated at the PCR hearing that the public defender "assigned" to the Petitioner's case referred him to Powell.

On April 8, 1991, the Petitioner moved for the appointment of counsel, indicating that although his parents had retained private counsel on his behalf, they were "not financially able to provide the means for an adequate defense for the enormity of the charges against him." The motion requested "additional counsel" to assist him, and that he "desire[d]" that Powell's private representation "continue if possible." The Spartanburg County Court of General Sessions, via Administrative Judge James B. Stephen, granted the Petitioner's request on the same day (April 8, 1991), appointing the "Spartanburg County Public Defender Office and Andrew J. Johnston of the Spartanburg County Bar" to represent the Petitioner "along with Hubert H. Powell, Jr.... whom has been retained by the parents of Richard W. Longworth."

Three days later, on April 11, 1991, the administrative judge issued the following amended order, *sua sponte:*

WHEREAS, this Court did enter an Order in this matter, dated April 8, 1991, and filed same with the Office of the Clerk of Court for Spartanburg County, South Carolina on April 8, 1991, at 11:45 a.m.,

NOW THEREFORE, upon re-consideration of the Petition and the charges against the Petitioner–Defendant, and to clarify the said Order, it is

ORDERED that the Spartanburg County Public Defender Office will represent the Petitioner, Richard W. Longworth.

IT IS FURTHER ORDERED that pursuant to the laws of South Carolina so providing, that Andrew J. Johnston of the Spartanburg County Bar is hereby appointed from the private bar to also represent the Defendant, Richard W. Longworth.

IT IS FURTHER ORDERED that Hubert H. Powell, Jr. of the Spartanburg County Bar has the position of attorney for the parents of the Defendant, Richard W. Longworth.

Assistant Public Defender Tom Dillard was assigned to the case as a result of this order. The Petitioner's father and mother separately testified at the PCR hearing that they were not aware until after the trial that the trial court had ordered Powell to hold the "position of attorney for the parents," rather than as attorney for the Petitioner as they had hired him to be. The Petitioner's father indicated that he did sign a "piece of paper" without reading it, and was told that it was for "getting more money from the state for my son's defense."

The amended order of April 11, 1991, is unusual; this Court can find no decision in any jurisdiction where a court ordered an attorney hired to represent a criminal defendant to instead represent that defendant's parents who had no charges pending against them. It appears from reading the PCR hearing testimony that Powell's role as a retained attorney was modified in order to pave the way for the Petitioner to receive appointed counsel, with access to state funds reserved for indigent defendants. As the Petitioner had already retained counsel, he would have been ineligible for indigent status; the retained attorney would need to be removed from the case and the Petitioner

would have to file an affidavit of indigence in order to qualify.

Because the Petitioner's parents (and apparently the Petitioner) wished to keep Powell as counsel, and in order for Powell to keep his agreed-upon fee, it appears that the administrative judge creatively shifted Powell's role to remove him from representing the Petitioner on the record, but to still keep an him in active role in the Petitioner's defense. The Deputy Public Defender (Dillard's supervisor) testified that the administrative judge contacted him directly and asked him to "draw an order" altering Powell's representation because the judge was "concerned that there may not be the finances necessary to conduct a death-penalty trial" without appointed counsel.

Powell testified that he was not aware of this amended order until a few weeks before trial, and that he discussed the order with the attorneys appointed by the trial court to represent the Petitioner. Powell and Johnston [14] indicated that they considered the April 11 order to do nothing to change the relationships among themselves or towards the Petitioner, that it was a "legal fiction," and that they acted during the entire process as if Powell was a third member of the Petitioner's defense team. Powell testified that, contrary to the Petitioner's parents' statements, he met with them and the Petitioner to discuss this amended order and its meaning. Powell also testified that he approached the trial judge presiding over the case (different from the administrative judge who issued the amended order) and, following the trial judge's instructions, remained in the case as normal.

It is clear that Powell's role was less significant than that of Johnston and Dillard. Powell testified that he was the primary liaison with the family and was significantly involved in the presentation of mitigating evidence, but denied acting against the Petitioner's interest due to his ordered role as attorney for the parents. Johnston echoed this description of Powell's role, and noted that he (Johnston) became the lead counsel in charge of the defense. The Petitioner disagrees, claiming that Powell simultaneously, actively represented the interests of both him and his parents, thereby suffering a direct conflict of interest. This conflict prejudiced the Petitioner, he argues, due to Powell's failure to fully present mitigating evidence of a tumultuous family life as a child, in order to protect the Petitioner's parents from repercussions such disclosure would have on them personally.

## B. The Law of Conflicts of Interest

The Supreme Court defined the boundaries of constitutionally effective counsel in the seminal case of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In discussing generally the standard for whether a criminal defendant's counsel was ineffective, the Court specifically addressed conflicts of interest.[15]

> An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the

---

**14.** Tom Dillard passed away prior to the PCR hearing.

**15.** It bears emphasizing that this Court is *not* evaluating the effectiveness of Powell's assis-

tance generally; this issue has been procedurally defaulted, as noted in Part II, *infra*. This Court is only interested in the *Strickland* decision to the extent that it discusses the conflicts of interest.

outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution.

In certain Sixth Amendment contexts, prejudice is presumed. Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance. Prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost. Moreover, such circumstances involve impairments of the Sixth Amendment right that are easy to identify and, for that reason and because the prosecution is directly responsible, easy for the government to prevent.

One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice. In *Cuyler v. Sullivan,* [446 U.S. 335, 345–50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)], the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, *see, e.g.* Fed. Rule Crim. Proc. 44(c), it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the *per se* rule of prejudice that exists for the Sixth Amendment claims mentioned above. Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and

that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* [446 U.S. at 350, 100 S.Ct. 1708] (footnote omitted).

*Strickland,* 466 U.S. at 691–92, 104 S.Ct. 2052 (some citations omitted).

Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. [*Holloway v. Arkansas,* 435 U.S. 475, 487–91, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) ]. But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance. [*Glasser v. United States,* 315 U.S. 60, 72–75, 62 S.Ct. 457, 86 L.Ed. 680 (1942) ].

*Sullivan,* 446 U.S. at 349–50, 100 S.Ct. 1708.

## C. Mitigating Evidence Not Presented at Sentencing

The PCR record indicates that the Longworth family had significant troubles, particularly when the Petitioner was younger. His parents admitted to frequent alcohol abuse, and to domestic violence resulting from alcohol abuse. This main trouble seems to have arisen after a grandchild (a son of one of the Petitioner's sisters) was sexually abused by his stepfather. The entire family moved in under one roof, which proved to be volatile. The Petitioner's mother testified that "there were terrible fights. They weren't just verbal fights. I would go crazy and tear up my whole house at times, and it wasn't just one time. It was many times. I broke everything I could get my hands on because I thought I was just dying." She left the family home for a time, with the Petitioner in tow. The father also left the home on a separate occasion to escape marital discord.

There was testimony that the Petitioner's older sister (whose son was abused) became addicted to prescription medication, that she also had trouble with alcohol as a teenager and frequently ran away from home. She further testified that the family's frequent re-location added to the stress of the situation. The older sister also indicated that the Petitioner admitted to her to using cocaine and LSD, and emphasized the Petitioner's troubles with alcohol.

The Petitioner's father testified that Powell promised to "do his very best to take care of the family and make sure that the family was protected." The Petitioner's mother indicated that she did not want evidence of their family trouble "to come out," because she was afraid that the disclosure of this family history would affect her license to foster handicapped children, as well as the regular income from the State which came with this care.[16] The Petitioner's father testified to his belief that any such disclosure could have, at the time of trial, cost him his job as a quality assurance manager for a petroleum company.[17] The parents both testified that in 1986, when they began to turn their lives around and applied for the certificate to foster children, they reduced their drinking to "social" drinking. They indicated that Powell told them before the Petitioner's trial to stop drinking alcohol completely, which they purportedly have done.

The Petitioner's mother further testified that Powell sought to keep the Petitioner in line with the defense team's theory; if the Petitioner did not "go along with what [Powell] suggested as the defense of the case," the mother said that Powell vowed the prosecution would "absolutely destroy us, and that would mean to bring out everything that ever happened, and I would have lost probably my little children." Nevertheless, the Petitioner's mother felt in hindsight that many topics of mitigation which may have helped the Petitioner were "left out" in order to "protect" the family, and that the jury should have been told about the general "chaos" which followed the family for several years. She also testified that Powell knew about these events but did not bring it out at trial or sentencing because he felt "it wouldn't do any good really."

Powell, on the other hand, testified that he always considered the Petitioner as his "true client," and that his actions in withholding or failing to present mitigating evidence at sentencing did not arise out of any obligation to the parents. He stated specifically that he did not prevent the family history from being disclosed to a social worker, who provided a social history of the Petitioner to assist the defense. The Petitioner's mother and sister met with the social worker, and the mother indicated that she disclosed the complete family history. The social worker's report, however, is not specific with respect to the family's difficult past. Powell did testify that he thought the Petitioner's mother was working "miracles" with the foster children, and that he "was trying to help them every way I knew how."

The PCR court found that there was no "actual conflict of interest which adversely affected the representation." After noting that the April 11, 1991, amended order was

16. However, under cross-examination, she testified that neither she nor her husband asked Powell *not* to reveal this information. But on re-direct examination, the Petitioner's mother said she told Powell not to bring this information to light "unless is was absolutely necessary" to help her son's defense.

17. There was also an allegation by Powell that the Petitioner had fathered a child out of wedlock. This allegation, however, was determined to be unfounded, as the Petitioner was in the Navy and out of the area when the child was conceived.

designed to afford the Petitioner public funds for his defense, the PCR court found Powell's testimony to be more credible than that of the Petitioner's parents, specifically with respect to whether he discussed the amended order with them and whether he affirmatively withheld information at sentencing to protect their interests. The court further found that any withholding or failure to provide information was either due to "oversight" or was not otherwise as a direct result of protecting the parents' interests.

The Magistrate Judge, after evaluating the record, found that the PCR court did not violate any "clearly established Federal law" or make an "unreasonable determination" of the facts to the law, as required under § 2254(d). He noted that many of the alleged errors or omissions, particularly with respect to Powell's competence generally, were not as a direct result of an interest in protecting the parents. After considering the Petitioner's mother's "conflicting" testimony regarding whether she asked Powell not to reveal the family history, *see supra* p. 562 & n. 16, the Magistrate Judge found that the PCR court's rejection was "fully supported by the record." "A fair reading of Mrs. Longworth's testimony is that she hoped the information would not be made public. However, [Mrs.] Longworth also indicated that she met with [the social worker] and told her of these difficulties." The Magistrate Judge also found reasonable the PCR court's conclusion that the amended order

was a "legal fiction," and that there was no obligation by Powell as a result of this order to represent the Petitioner's parents. Any "pecuniary interest" in withholding the family history was rejected because the parents stopped drinking at the time they began to provide a home for foster children.

### D. Analysis

■ Under *Strickland* and *Sullivan*, the first question is whether prejudice is presumed, or whether the Petitioner must actively prove its existence. This, in turn, requires the Court to determine whether Powell "actively represented conflicting interests." *Strickland*, 466 U.S. at 692, 104 S.Ct. 2052 (quoting *Sullivan*, 446 U.S. at 350, 100 S.Ct. 1708).[18] As noted, the Petitioner has pointed out several specific issues of mitigation which the jury did not hear, purportedly as a result of this conflict of interest in seeking to protect the parents' integrity. However, the crucial fact in this analysis is that *the Petitioner's parents were not charged with any crime.* There was, therefore, no "concurrent representation" of jointly charged defendants, which is the ultimate conflict of interest problem. *Mickens v. Taylor*, 122 S.Ct. at 1245 (noting that prior cases, including *Sullivan* and *Holloway*, "stressed the high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice").

As the Supreme Court recognized in *Mickens*, "not all attorney conflicts present

---

18. Given the Supreme Court's confidence in the trial courts' "ability ... to make early inquiry in certain situations likely to give rise to conflicts," *Strickland* 466 U.S. at 692, 104 S.Ct. 2052, the amended order affecting Powell's role as counsel is even more unusual because it appears that the trial court not only was aware of the alleged conflict, but actually *created* it. *See Cuyler v. Sullivan*, 446 U.S. at 347, 100 S.Ct. 1708 (noting that a trial court should "initiate an inquiry" where it "knows

or reasonably should know that a particular conflict exists"). Nevertheless, as the Supreme Court later held in *Mickens v. Taylor*, 535 U.S. 162, 122 S.Ct. 1237, 1243–46, 152 L.Ed.2d 291 (2002), the fact that the trial court should have known of a potential conflict does not require automatic reversal of the conviction, and in fact does nothing to change the standard set out in *Strickland* and *Sullivan. Id.*

comparable differences," which results in a varying (and lesser) degree of scrutiny in criminal matters where, for example, "counsel previously represented another defendant in another substantially related matter, even where the trial court is aware of the prior representation." *Id.* at 1245–46 (citation and footnote omitted). Indeed, the Court noted that the circuit courts of appeals have engaged in an "expansive application" of the standard which "the language of *Sullivan* itself does not clearly establish, or indeed support." *Id.* In other words, the Supreme Court found that *Sullivan*'s concurrent representation standard had been applied in situations not envisioned by the *Sullivan* Court.

The Court further noted that the "purpose" of the *Sullivan* and *Holloway* standards was "not to enforce the Cannons of Legal Ethics, but to apply needed prophylaxis in situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel." *Id.* "[B]reach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel." *Id.* (quoting *Nix v. Whiteside*, [475 U.S. 157, 165, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) ] ). In the end, however, because it was not presented with this issue squarely, the Court declined to resolve the scope of *Sullivan*, leaving it an "open question." *Id.* at 1246.

For practical purposes, therefore, the Supreme Court made it clear that applying *Sullivan* "unblinkingly" to "all kinds of alleged attorney ethical conflicts," *id.* at 1245 (quoting *Beets v. Scott*, 65 F.3d 1258, 1266 (5th Cir.1995) (en banc)), is unwise, but has left intact (at least for the moment) circuit court opinions making such expansions. *See also Moss v. United States*, 323 F.3d 445, 461–64 (6th Cir.2003) (noting the distinction drawn by the *Mickens* Court). The *Mickens* decision itself affirmed and left unchanged the holding

and analysis on the conflict of interest issue set out by the Fourth Circuit in *Mickens v. Taylor*, 240 F.3d 348 (4th Cir. 2001). However, the court there only focused its analysis on the "adversely affect" portion of the standard, and not the "actively represented" portion.

Looking elsewhere, the Fourth Circuit has interpreted the "actively represented" standard to mean that the Petitioner must demonstrate that the attorney represented interests which "diverge[d] with respect to a material fact or legal issue or to a course of action." *Gilbert v. Moore*, 134 F.3d 642, 652 (4th Cir.1998) (en banc) (quoting *Sullivan*, 446 U.S. at 356 n. 3, 100 S.Ct. 1708 (Marshall, J., concurring in part and dissenting in part)).

> The two requirements, an *actual conflict* of interest resulting in an *adverse effect* on counsel's performance, are often intertwined, making the factual analyses of them overlap. An attorney has an actual conflict when he actively represents conflicting interests. *Sullivan*, 446 U.S. at 350, 100 S.Ct. 1708. His representation of conflicting interests, however, is not always as apparent as when he formally represents two parties who have hostile interests. He may harbor substantial personal interests which conflict with the clear objective of his representation of the client, or his continuing duty to former clients may interfere with his consideration of all facts and options for his current client. When the attorney is actively engaged in legal representation which requires him to account to two masters, an actual conflict exists when it can be shown that he took action on behalf of one. The effect of his action of necessity will adversely affect the appropriate defense of the other. Moreover, an adverse effect may not always be revealed from a review of the affirmative actions taken. Rather, the failure to take actions that

are clearly suggested from the circumstances can be as revealing. *United States v. Tatum,* 943 F.2d 370, 375–76 (4th Cir.1991).[19]

Arguably, even though the Petitioner's parents were not being actively represented as defendants, there is some evidence (although conflicting) that (1) Powell was appointed to represent the parents' interests and (2) Powell told the parents he would "protect" certain family information from being disclosed. The question, however, is not whether there is evidence to support the Petitioner's contention, but rather whether the PCR court's decision was an "unreasonable determination" of the facts. *See* § 2254(d). The PCR court, after hearing the testimony and judging the witnesses' credibility, chose to accept Powell's testimony over that of the Petitioner's parents. These determinations are presumed to be correct under § 2254(e). *See Maynard v. Dixon,* 943 F.2d 407, 417 (4th Cir.1991).

The Magistrate Judge concluded, and this Court agrees, that this determination was not unreasonable under the facts and circumstances of the evidence. The simple fact is that there was conflicting evidence which the PCR court was forced to evaluate and resolve. It chose to credit Powell's and Johnston's testimony regarding the mitigation factors, and not the parents' testimony. This is not unreasonable, particularly considering the Petitioner's mother's ambiguity and contradiction on the subject. It is not as if the PCR court invented testimony or creatively implied

that certain things were said; Powell specifically stated that the Petitioner was his only client, that he explained the amended order to both the parents and the Petitioner, that he did not prevent any of the social history from being discussed, and that he did not actively seek to protect the parents at the Petitioner's expense.

Assuming for the moment that Powell's "representation" of the Petitioner's parents can be considered "actively representing diverse interests," the question then becomes whether the conflict "actually affected the adequacy of his representation." *Sullivan,* 446 U.S. at 349, 100 S.Ct. 1708. Again, the PCR court accepted Powell's and Johnston's testimony that neither the amended order nor the parents' interests had any effect on their representation. This finding is presumptively correct, which presumption must be overridden by the Petitioner. *See* § 2254(e).

Powell testified that it was his co-counsel, Johnston, and not he who "drafted the nonstatutory mitigating circumstances that were presented to the ... jury." Powell indicated that he shared all the information related to him by the family to his co-counsel, and that they agreed on a course of action. Powell questioned the family on direct examination because he was most familiar with them and had more contact with them than Dillard or Johnston.

Johnston testified that he developed the defense strategy with his co-counsel's agreement. He focused on two primary factors in developing the mitigation strate-

---

19. Indeed, the Supreme Court in *Mickens v. Taylor,* 122 S.Ct. at 1244 n. 5, clarified prior language which was later misinterpreted by lower courts. The Court noted that "the *Sullivan* standard is not properly read as requiring inquiry into an actual conflict as something separate and apart from adverse effect. An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." This, however, does *not* alter the requirement, as stated in *Sullivan,* that there must first be a "conflict of interest," defined as proving that counsel "actively represented conflicting interests." *Sullivan,* 446 U.S. at 350, 100 S.Ct. 1708; *see Gilbert v. Moore,* 134 F.3d 642, 652 (4th Cir. 1998) (en banc) (citing *Sullivan* ); *Wilson v. Moore,* 178 F.3d 266, 280 (4th Cir.1999) (same).

gy: (1) the Petitioner's excessive drinking; and (2) the Petitioner being under the "influence" of David Rocheville.[20] Johnston also indicated that he knew of the family's history of alcohol abuse, drug abuse and violence. He stated that he did not "consciously" leave out the mitigating evidence of family strife when briefing the expert witnesses, but that it was an "oversight." The social worker's report, Johnston admitted, was "not very good" at preparing the expert witnesses, but this admission is a far cry from preventing its disclosure due to a desire to protect the parents, as the Petitioner claims. Johnston also testified that he told at least one of the defense experts that the family had some trouble with abuse of alcohol and resultant "marital discord," but that it was essentially "unremarkable."

In sum, Powell was aware of the mitigating evidence, and passed it along to the lead attorney in the case. He did not prevent this information from being disclosed to the social worker, nor tell the parents to withhold this information. Johnston knew of the allegedly withheld information, revealed this information to an expert psychiatrist, and made a conscious, strategical decision that the mitigating evidence at issue was not sufficiently beneficial to be presented in connection with his theory of the defense. This in itself undermines the Petitioner's contention that Powell kept this information from the jury because he was beholden to the parents. There being no violation of "clearly established Federal law" and no "unreasonable determination of the facts in light of the evidence presented," *see* § 2254(d), this line of argument must be rejected.

### E. Standard Prejudice

█ Because prejudice cannot be presumed in this case, the Petitioner may still affirmatively prove prejudice under the usual standard set forth in *Strickland*. 466 U.S. at 693, 104 S.Ct. 2052.[21] The

---

**20.** Johnston testified in relevant part as follows:

I never entertained any hope of a not-guilty verdict. I saw no possibility of a reduced homicide level such as a voluntary manslaughter. I never saw any of that as a possibility.

To my way of thinking at the time and now, it would have been a great victory if he had received a sentence other than death. So that was my goal.

Now, how was I going to get there? We tried to look at the statutory mitigating circumstances and what would be applicable to this case. He didn't have any significant record, maybe a little magistrate's conviction or something like that. He was young at the time that this had happened. He had had some emotional problems. He wasn't psychotic, but he had had some emotional problems.
. . .

Other—the other thing is we were trying to emphasize the lesser role of Mr. Longworth when looked at with Mr. Rocheville's greater role that I think was supported by the evidence, also possibly trying to argue that he was under duress from Mr. Rocheville, or not under duress but under the dominion, the influence, of Mr. Rocheville. I think there was something to that.

I also wanted the jury to know that he had a history himself of substance abuse and that he may have actually been highly intoxicated at the time the offenses occurred, which, of course, would not be a defense, but it might possibly be mitigating factors. So that was basically the theory in a nutshell.

**21.** The Petitioner specifically alleges ineffective assistance of counsel based upon the conflict of interest. As part of Ground 19, he did allege that there was ineffective assistance generally for failing to properly investigate, prepare and present mitigating evidence at sentencing. This ground was not considered on the merits as it was deemed to be procedurally defaulted. *See supra* Part II. However, in the interests of justice, the Court will undertake a limited review of this claim, as it arises as a directly-related sub-issue to the conflict of interest question.

question then becomes whether, if the mitigating evidence not presented is considered, there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052 (adopting the same standard as used for "materiality of exculpatory information not disclosed to the defense by the prosecution"). It has been noted that this standard is more "onerous" than the "actual conflict" standard, *see Beets v. Collins,* 986 F.2d 1478, 1487 (5th Cir.1993), and, thus, that if there is no actual conflict there can be no proof of prejudice. However, to the extent this is not the case, the Court will analyze what the jury knew as of the time it imposed the death penalty, and will consider whether the mitigating evidence not presented could have affected their judgment.

At the sentencing phase of the Petitioner's trial, the jury heard expert testimony that the Petitioner abused alcohol extensively since he was a teenager,[22] had a behavioral disorder of some sort (antisocial or schizoid personality), and may have possessed a "depersonalization organic personality syndrome," all resulting in the possibility of a "diminished capacity" at the time of the murders. There was testimony that the Petitioner was tested at age fourteen for difficulties coping in school, being withdrawn and having difficulty developing relationships. A forensic psychiatrist opined that the Petitioner suffered dysthymia, which is a separate but related aspect of depression, and that the Petitioner described a "depersonalization experience" after Alex Hopps was shot, meaning that he was "less capable of acting on [his] own" than he normally would.

The jury also heard that the Petitioner moved in with a significantly older woman at age seventeen and that he was emotionally "devastated" when this relationship ended with the woman marrying his best friend. The Petitioner's older sister testified that during this relationship, the Petitioner would use beer, liquor, marijuana and pain medications in combination. The Petitioner's family all stated that the Petitioner never got over this relationship.

There was non-expert testimony from the Petitioner's family (including both parents), friends and caretakers that he had severe troubles with alcohol. His older sisters supplied him with beer as a teenager. Witnesses indicated that after the loss of his girlfriend he never seemed to stop drinking. This constant drinking resulted in lost jobs, including a job as an assistant manager for the movie theater company he later robbed. After being discharged from the Navy for a medical condition (unidentified seizures), there was testimony that the Petitioner radically changed in appearance, demeanor and articulation.

Witnesses testified at sentencing that the Petitioner idolized David Rocheville, to the point of being his "flunky," despite his family's lack of acceptance of Rocheville, who every one of the Petitioner's family disliked. The Petitioner's father even sent him to live with an older sister in Florida because he was concerned that Rocheville would get him into trouble. Rocheville was described as rude, unkempt, dirty and often intoxicated, and the Petitioner's family indicated that there was "something about" Rocheville that was unpleasant or frightening. The Petitioner's father described Rocheville as a "con," and others said they sensed that Rocheville was "evil."

Over the Christmas holidays in December, 1990, just days before the murders, the family reports the Petitioner as being

---

**22.** Dr. David Price, psychologist, drew a distinction between "alcohol abuse" and "alcohol intoxication," and concluded that the Petitioner suffered from the effects of both conditions.

"belligerent" and "angry," which was not typical, even when the Petitioner was drinking. The Petitioner obtained a large-caliber pistol in the latter part of 1990, and was frequently seen carrying it, and even showed it to several co-workers. One witness testified that the Petitioner threatened to shoot him after he urged the Petitioner to stop throwing beer cans off the roof of the theater.

The Court agrees with the Petitioner's trial counsel that the two strongest arguments against imposing the death penalty were the Petitioner's excessive drinking and the apparent influence David Rocheville had over him. It was not unreasonable to focus the inquiry on these two factors. The material not presented to the jury would not have affected the jury's attitude or sentiments towards the Petitioner. The fact that the Petitioner's family abused alcohol and drugs and had violent confrontations does nothing but reinforce the Petitioner's own tendency towards addictions, which the jury found insufficient to override the aggravating factors. The Petitioner presented evidence indicating a possible organic brain injury, which is much more compelling than any of the evidence not presented, but again the existence of this condition, if believed, was not sufficient to override the aggravating factors.

The specific facts of the case indicate that the Petitioner knew that someone was going to be killed, or at least was recklessly indifferent to human life—at least after Alex Hopps was shot. The fact that the Petitioner came from an alcoholic household would do nothing to alter the jury's perception of the Petitioner's actions, knowledge and/or intent on that night. If severe alcohol abuse and the influence of David Rocheville were insufficient, the addition of this evidence would not have made a difference.

Moreover, this is not a case where the evidence demonstrated that the Petitioner was repeatedly beaten, molested or emotionally abused, making his tendencies towards violence and crime more subconscious or his moral culpability significantly reduced. *Compare Kenley v. Armontrout,* 937 F.2d 1298, 1304–09 (8th Cir.1991) and *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 2542, 156 L.Ed.2d 471 (2003).[23] All

---

**23.** The *Kenley* court vacated a death sentence where counsel failed to present evidence in mitigation of a mentally ill father who made constant death threats against defendant, defendant's history of attempted suicide, and evidence of anti-social personality. The Supreme Court in *Wiggins* found "powerful" mitigating evidence not revealed at sentencing, including the fact that the petitioner "experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother." *Id.* at 2542. He also "suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care." *Id.* There is no evidence that the Petitioner suffered a similarly tortuous childhood, clearly distinguishing his case from *Wiggins* and *Kenley.*

Though not directly at issue here, the *Wiggins* and *Kenley* decisions also note that counsel failed to pursue leads and investigate this mitigating evidence, which was reasonably available for counsel to discover. Again, this precise issue has been procedurally defaulted. As an alternative finding, however, in the event that the argument is found to be not procedurally defaulted, it is clear that the investigation of the Petitioner's past was far more adequate than that in *Kenley* and *Wiggins.* The Supreme Court noted in *Wiggins* that counsel "abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 123 S.Ct. at 2537 (citing the ABA Guidelines for capital defense work). In *Kenley,* the court noted that there was a significant amount of mitigating evidence which was readily available to counsel, but not investigated. 937 F.2d at 1308. Here, by contrast, the evidence demonstrates that an investigation was made into the Petitioner's social, family, educational, medical, and employment history, through family members, medical records and experts,

the evidence of violence was between and directed at the Petitioner's parents, not the Petitioner or his sisters, and the violence presented was not severe. In short, the Court agrees with the PCR court and the Magistrate Judge that there is no probability that, even considering the mitigating evidence, "the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. The Petitioner's arguments in this regard are therefore rejected.[24]

## CONCLUSION

Based on the foregoing, it is

ORDERED that the Petitioner's objections to the report and recommendation are rejected; that the Magistrate Judge's report and recommendation is affirmed; that the Respondents' motion for summary judgment is granted; that the Petitioner's petition for writ of habeas corpus is denied; that the stay of execution imposed by this Court is lifted; and that this action is ended.

**IT IS SO ORDERED.**

---

and that this information was known to counsel, but that counsel made the strategic decision not to use it because it was "unremarkable." *See also Byram v. Ozmint,* 339 F.3d 203 (4th Cir.2003) ("the reasonableness of an investigation, or a decision by counsel that forecloses the need for an investigation, must be considered in light of the scarcity of counsel's time and resources in preparing for a sentencing hearing and the reality that counsel must concentrate his efforts on the strongest arguments in favor of mitigation") (quoting *McWee v. Weldon,* 283 F.3d 179, 188 (4th Cir.2002)).

Moreover, this Court reiterates its conclusion that, even if the investigation was unreasonable, there was no prejudice at the sentencing hearing because there is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *see Wiggins,* 123 S.Ct. at 2542 (citing same).

**24.** The Petitioner also requested a hearing on the conflict of interest question. Under the Rules Governing Section 2254 Cases in the United States District Courts ("Habeas Rules"), Rule 8(a), the court shall determine, in its discretion, whether an evidentiary hearing is required. If the court finds a hearing is not required, then "the judge shall make such disposition of the petition as justice shall require." *Id.* The court's discretion in determining whether a hearing is needed is "broad." *See Maynard v. Dixon,* 943 F.2d 407, 411–12 (4th Cir.1991) (noting that the courts have the discretion to determine if a legal issue should even be briefed) (citing C. Wright, A. Miller & E. Cooper, 17A Federal Practice and Procedure: Jurisdiction 2d § 4268.3, at 505–17 (1988)). The Court finds in its discretion that no hearing is required, as the legal issue has been adequately briefed and the evidence pertaining to this issue is voluminous and well preserved.